**In re Drew V. TIDWELL, Respondent**

**A Member of the Bar of the District of Columbia Court of Appeals.**

No. 99–BG–1569.

District of Columbia Court of Appeals.

Argued March 14, 2003.
Decided Sept. 11, 2003.

Drew V. Tidwell, pro se.

Judith Hetherton, Assistant Bar Counsel, with whom Joyce E. Peters, Bar Counsel, was on the brief, for the Office of Bar Counsel.

Before TERRY and STEADMAN, Associate Judges, and PRYOR, Senior Judge.

TERRY, Associate Judge:

Respondent Tidwell is a member of the District of Columbia Bar and has also been admitted to practice in New York, Virginia, the United States District Court for the Western District of New York, and the United States Supreme Court. He became the subject of disciplinary proceedings in the state of New York after he entered a plea of guilty on September 3, 1999, to a charge of leaving the scene of a fatal automobile accident without reporting it.[1] After receiving notice of Mr. Tidwell's conviction and subsequent disbarment in New York, this court ordered that he be temporarily suspended from the practice of law in the District of Columbia pursuant to D.C. Bar Rule XI, § 10(c).

We then directed our Board on Professional Responsibility ("the Board") to institute disciplinary proceedings and, in particular, to determine whether the offense of which Mr. Tidwell was convicted in New York involved moral turpitude *per se.* We also ordered the Office of Bar Counsel to state its views concerning the appropriate disciplinary sanction. With respect to whether the crime involved moral turpitude *per se,* Bar Counsel concluded that the issue was "unclear" and recommended that a hearing be held on the question of whether the crime involved moral turpitude on its specific facts.

The Board ruled that the crime did not involve moral turpitude *per se* and referred the matter to a hearing committee to determine whether a finding of moral turpitude could be based on the facts and circumstances surrounding the offense. *See* D.C.Code § 11–2503(a) (2001). Before the hearing committee considered the matter, Bar Counsel filed a formal petition asserting that Mr. Tidwell's conviction involved moral turpitude on its facts and that his actions also violated Rule 8.4(b) of the District of Columbia Rules of Professional Conduct.[2] After an evidentiary hearing, the hearing committee ruled, *inter alia,* that the facts underlying Mr. Tid-

---

1. *See* N.Y. VEH. & TRAF. LAW § 600(2)(a) (2002).

2. Under Rule 8.4(b), "[i]t is professional misconduct for a lawyer to ... commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects."

well's conviction warranted a finding of moral turpitude and recommended his disbarment. Bar Counsel did not contest the hearing committee's decision, but Mr. Tidwell appeared before the Board and orally argued his exceptions.

In July 2002 the Board issued its report and recommended Mr. Tidwell's disbarment. Mr. Tidwell filed written exceptions with the court, and Bar Counsel filed a brief in support of the Board. We agree with Bar Counsel and the Board, adopt the Board's recommendation, and order that Mr. Tidwell be disbarred in the District of Columbia.

## I. FACTUAL BACKGROUND

Mr. Tidwell was admitted to the District of Columbia Bar in 1978 and continued to practice here until moving to Buffalo, New York, in 1984. Since that time he has lived and maintained a law practice in the state of New York.

Over approximately the last ten years, Mr. Tidwell developed a drinking problem and acknowledged before the hearing committee that he was an alcoholic. His record of alcohol abuse includes an arrest on October 6, 1995, for driving while intoxicated.[3] Several months later, Mr. Tidwell voluntarily admitted himself into an alcohol treatment center in Buffalo. Even after that treatment, however, Mr. Tidwell's drinking was not under control. He testified before the hearing committee that by the time of the incident that led to these proceedings, he had resumed his regular practice of drinking three bourbons every day after work. Mr. Tidwell also admitted suffering from alcohol-related blackouts prior to his 1995 arrest, but not afterwards.

On the evening of August 17, 1999, Mr. Tidwell left work and drove to the Audubon Room, a bar near the University of Buffalo where he was a frequent customer. While there, from about 7:30 p.m. to a little after 9:00 p.m., Mr. Tidwell paid for three glasses of Maker's Mark whiskey. At the hearing he testified that he consumed the three drinks straight, over ice, and that he had not eaten anything that day since lunch, about five hours earlier. Shortly after 9:00 p.m. Mr. Tidwell left the Audubon Room to go home. While driving home in his Mercury Mystique, he traveled on Getzville Road, a two-lane street that was later described by police as well-lit. At the same time, Donald Fruehauf, a heavy-set 68–year–old auto mechanic, was riding his bicycle on the same road. Mr. Fruehauf was known to ride his bicycle on the neighborhood streets the night before the trash was collected, looking for discarded items that he could possibly repair. The trash on Getzville Road was scheduled to be picked up the following morning.

At about 9:30 p.m. Mr. Tidwell's Mercury Mystique struck Mr. Fruehauf's bicycle from the rear.[4] As a result of the collision, Mr. Fruehauf was thrown into the air and struck the windshield on the right side of Mr. Tidwell's car. The impact shattered the windshield. The collision also dented portions of the bumper, scratched the hood, and broke off a portion of the turn signal lens. A few moments later, a passing motorist found Mr. Fruehauf lying in the road with blood coming from his ears; his bicycle was on top of him. After someone called 911, Mr. Fruehauf was taken to a nearby hospital, where he died later that night as a result of severe head injuries.

---

**3.** At the time of that arrest, Mr. Tidwell's blood alcohol level was close to two and one-half times the legal limit in New York.

**4.** Witnesses told police that around the time of the accident, they heard screeching tires and a loud bang.

After hitting Mr. Fruehauf, Mr. Tidwell continued driving home without stopping or calling the police. He initially claimed at the hearing that he had no recollection of the accident, but when questioned later by members of the hearing committee, he admitted that he had panicked after he struck Mr. Fruehauf.[5] He also said that he did not immediately notice the damage to his car upon arriving at home, but discovered it the next day when he went out to the car, intending to drive to work.

Early in the morning of August 18, Mr. Tidwell's wife told him that a fatal accident had occurred the previous night, but he dismissed the idea that he was associated with it because initial police accounts reported that a green minivan was involved. He testified that he thought the damage to his car might have been caused by vandals,[6] so he moved the car into the garage and got a ride to work with his wife.

Mr. Tidwell telephoned his attorney, Michael Taheri, the following day, August 19, because of lingering concerns that he might have been involved in the accident on August 17. After a short conversation, however, the two men decided that Tidwell need not worry because the police were looking for a green minivan, and they agreed to talk again in a few days. Then, on his way to work on August 21, Mr. Tidwell heard a news broadcast on the radio stating that law enforcement officers were looking for a Mercury Mystique in connection with the fatal accident on August 17.[7]

Upon hearing this news, Mr. Tidwell telephoned Mr. Taheri, who decided to come to the Tidwell house and inspect the car, which was still in the garage. After photographing the car, Mr. Taheri contacted an Assistant District Attorney and arranged for the car to be surrendered. As part of his attorney's subsequent negotiations with an Assistant District Attorney, Mr. Tidwell agreed to surrender the car and, in return, to be charged with one count of leaving the scene of an accident resulting in a fatality, a Class E felony in New York. Mr. Tidwell also agreed to serve a one-year jail sentence at a local facility.[8]

On September 3, 1999, Mr. Tidwell entered a guilty plea and agreed to waive his right to appeal from his conviction and sentence. When the court at the plea hearing asked him what happened on the night of the accident, Mr. Tidwell replied, under oath, "I was driving down Getzville Road, [and] I hit a person with my vehicle. I panicked at the time … and proceeded home, and I failed to report the accident when I was able to do so." He was allowed to remain free on bail pending sentencing. Several weeks later, on November 17, 1999, he received a sentence of one year, to be served at the Erie County Jail, of which he actually served eight months ("the normal two-thirds of a determinate sentence," according to the Board). Mr. Tidwell was automatically disbarred by the state of New York as a result of this conviction. *In re Tidwell*, 265 A.D.2d 941,

---

5. Mr. Tidwell testified that when he saw the car's windshield the next morning, he remembered hitting "something" the night before. He also stated that he was "in denial" about what happened that night.

6. At the hearing, however, Mr. Tidwell presented no evidence that he called either the police or his insurance company about the suspected vandalism.

7. On August 20 the police linked the fragments of the turn signal lens found at the scene to a 1995–1997 Mercury Mystique.

8. Also as part of the agreement, local police were prohibited from speaking to Mr. Tidwell or his wife and were not allowed to search either his home or his office.

700 N.Y.S.2d 411 (1999).[9] On December 22, 1999, Mr. Tidwell settled a wrongful death claim brought by Mr. Fruehauf's estate.

## II. MORAL TURPITUDE

When considering a recommended disciplinary sanction against an attorney, this court will accept the Board's findings of fact if they are supported by substantial evidence. *See, e.g., In re Davenport,* 794 A.2d 602, 603 (D.C.2002); *In re Clarke,* 684 A.2d 1276, 1280 (D.C.1996); D.C. Bar Rule XI, § 9(g)(1). In addition, the court will adopt the Board's recommended sanction "unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. Bar Rule XI, § 9(g)(1); *see also In re Spiridon,* 755 A.2d 463, 468 (D.C.2000). This court will, however, "review *de novo* any Board determination of moral turpitude, since 'the ultimate issue of moral turpitude is one of law rather than of fact.'" *In re Kerr,* 611 A.2d 551, 553 (D.C.1992) (citing *In re Shillaire,* 549 A.2d 336, 343 (D.C. 1988)).

Mr. Tidwell challenges the conclusion of the hearing committee and the Board that his actions warranted a finding of moral turpitude. In particular, he argues that the facts and circumstances surrounding his crime do not fit the definition of moral turpitude, and that the Board's failure to agree that certain cases support his position undermines its final report. We hold that these arguments are without merit.

The leading case in this jurisdiction for assessing whether certain conduct in-volves moral turpitude, thus requiring automatic disbarment after a conviction, is *In re Colson,* 412 A.2d 1160 (D.C.1979) (en banc). In *Colson* this court adopted a dictionary definition of moral turpitude as "[a]n act of baseness, vileness or depravity in the private and social duties which a man owes to his fellow men or to society in general, contrary to the accepted and customary rule of right and duty between man and man." *Id.* at 1168 (citation omitted). We also explained that if an act is categorized as one involving moral turpitude, it is generally because that act offends the "generally accepted moral code of mankind." *Id.* Other conventional sources define moral turpitude as "conduct that is contrary to justice, honesty, or morality." BLACK'S LAW DICTIONARY 1026 (7th ed.1999); *see also In re Sneed,* 673 A.2d 591, 594 (D.C.1996) (paraphrasing *Colson* ).

The hearing committee concluded, and the Board agreed, that because Mr. Tidwell knew he had hit someone and failed to stop or to notify the authorities afterward, his conduct involved moral turpitude. This conclusion was supported by Mr. Tidwell's own admissions. For example, during his plea hearing in New York, Mr. Tidwell told the court, "I was driving down Getzville Road, [and] I hit a person with my vehicle. I panicked at the time ... and proceeded home, and I failed to report the accident when I was able to do so." At his sentencing hearing, Mr. Tidwell said essentially the same thing: "I struck a person on a bike ... [and] ... I should have stopped." Even before the hearing committee, Mr. Tidwell testified

---

**9.** Mr. Tidwell was later disbarred by the United States District Court for the Western District of New York, *see In re Tidwell,* 139 F.Supp.2d 343 (W.D.N.Y.2000), *aff'd,* 295 F.3d 331 (2d Cir.2002), and by the United States Supreme Court, *see In re Tidwell,* 532 U.S. 1050, 121 S.Ct. 2209, 149 L.Ed.2d 1041, *motion for reconsideration denied,* 534 U.S. 947, 122 S.Ct. 388, 151 L.Ed.2d 296 (2001). His license to practice in Virginia was also revoked. *See Tidwell v. Virginia State Bar,* 262 Va. 548, 554 S.E.2d 451 (2001).

that he knew he had hit "something" and that he panicked afterward.

Given this evidence, the Board, like the hearing committee, found "not credible" Mr. Tidwell's testimony that he was unaware of striking Mr. Fruehauf, calling it "vague and inconsistent." As the Board said in its report:

> It simply defies common sense under the facts of this case for respondent to claim to be unaware that he struck a person, when that person, weighing 250 pounds, crashes into the car's windshield and shatters it.... It further defies common sense and logic for respondent to claim that he was unaware that his car had sustained any damage until the day after the accident when the windshield was massively damaged, and especially when pieces of the shattered windshield were projected into the car and onto the passenger seat.
>
> \*  \*  \*  \*  \*  \*
>
> ... The hearing established more than just respondent's knowledge; it established *a particularly callous disregard for another human being* as respondent left the scene after causing serious injury to Mr. Fruehauf without rendering any aid or assistance and, most significantly, that respondent made no effort to determine whether Mr. Fruehauf, who was left lying in the roadway, needed help and assistance. [Emphasis added.]

The Board could reasonably conclude that Mr. Tidwell's failure to stop his car after he hit Mr. Fruehauf—with a force that shattered the right side of the windshield and was loud enough to be heard by neighbors in their houses—certainly violated the "generally accepted moral code." *In re Colson*, 412 A.2d at 1168; *In re Sneed*, 673 A.2d at 594. His failure to notify the authorities until several days later makes his conduct even more "contrary to justice,

honesty, or morality." BLACK'S LAW DICTIONARY 1026 (7th ed.1999). On this record, we have no doubt that Mr. Tidwell's conduct fits easily within the definition of moral turpitude that this court has adopted in *Colson* and other cases.

Mr. Tidwell relies on three cases which, he maintains, indicate that conduct similar to his does not necessarily support a finding of moral turpitude. The Board considered those cases—*In re Reynolds*, 763 A.2d 713 (D.C.2000); *In re Small*, 760 A.2d 612 (D.C.2000); and *In re Hoare*, 727 A.2d 316 (D.C.1999)—and found them distinguishable in various respects. We agree with the Board that those cases are inapposite here.

*In re Reynolds* involved an attorney who was convicted in Virginia of two counts of driving while intoxicated, one count of "hit-and-run," and one count of eluding a police officer. We suspended him from practice for six months, despite the fact that he suffered from a serious alcohol problem which included four previous charges of driving while intoxicated. *See* 763 A.2d at 714–715. While both Tidwell and Reynolds suffered from alcohol problems, and each of them had an accident while driving after drinking, there are two key distinctions between their cases. First, Reynolds was convicted only of misdemeanors, not a felony like Mr. Tidwell. Second, and more importantly, no one was killed as a result of Reynolds' conduct.

Comparable differences can be found in the *Hoare* and *Small* cases. *In re Hoare* involved the suspension of an attorney for two years after he was convicted of aggravated reckless homicide in Illinois. In that case an intoxicated attorney drove in the wrong direction on an interstate highway and collided with another car, killing the driver. But Hoare's conduct, while egregious, was found not to involve moral

turpitude because he, unlike Mr. Tidwell, never left the scene of the accident. Additionally, a court-ordered evaluation found that Hoare did not have any alcohol problems, nor was he likely to commit a similar act in the future. The same cannot be said with respect to Mr. Tidwell.

*In re Small* also offers Mr. Tidwell little support. Small was suspended from practice for three years after being convicted of negligent homicide while driving drunk and crashing into a tree, killing his passenger. While both Small and Tidwell were involved in fatal car accidents after drinking alcohol, there was no evidence that Small tried to leave the scene afterwards, a critical fact on which the Board relied in concluding that Mr. Tidwell's actions involved moral turpitude.

The Board likened Mr. Tidwell's case to a Texas case with similar facts. In *Tate v. State Bar*, 920 S.W.2d 727 (Tex.Ct.App. 1996), an attorney, who had been drinking, fled from the scene of an accident after the car he was driving struck three young boys, killing one of them and seriously injuring the other two. When confronted by the authorities, Tate at first denied any connection with the accident, but several days later he admitted his involvement. He was charged with three counts of failure to stop and render assistance, a felony under Texas law, and was later convicted on a plea of *nolo contendere*. This conviction was held to involve moral turpitude,

and Tate was subsequently disbarred. *Id.* at 730. The court agreed that the crime was not one of moral turpitude *per se*, noting by way of example that a hypothetical motorist might have been on the way to a hospital with his pregnant wife who was about to give birth, so that he could not stop and give aid to an injured accident victim. *Id.* at 729. But in Tate's case there were no such mitigating factors, and thus the court held that his crime involved moral turpitude on its facts.[10]

In short, we agree with the Board that *Reynolds, Hoare,* and *Small* do not support Mr. Tidwell's contentions because each of those cases is factually distinguishable from his case. We also agree that this case closely resembles *Tate,* and that the result in *Tate* supports the Board's recommendation here.[11]

Finally, Mr. Tidwell contends at some length that this court should ignore the comments he made about the accident during his plea and sentencing hearings in New York because our reliance on them would deter defendants from making in-court apologies. He maintains that to allow his apologies and related comments to establish culpability is against public policy. What he fails to recognize, however, is that while he described more fully during those court proceedings the events surrounding the accident, he also testified before our hearing committee to the essential elements of the crime, acknowledging that

---

**10.** This court did not allow for any mitigating circumstances in *In re Hopmayer*, 625 A.2d 290 (D.C.1993). *Hopmayer* involved an attorney convicted of a felony involving moral turpitude *per se* who later argued that his alcoholism should be considered to mitigate his otherwise mandatory disbarment. We held that once an attorney is convicted of an offense involving moral turpitude, disbarment is mandatory, regardless of any mitigating circumstances such as alcoholism. Although the offense in *Hopmayer* involved moral turpitude *per se,* this court also observed that the

same result would follow if the offense were one deemed to involve moral turpitude on its facts after a hearing. *Id.* at 292.

**11.** The Board, in a footnote, cited a recent case in this jurisdiction with facts similar to those presented here. The attorney in that case, however, consented to disbarment, so the underlying facts were not set forth in our disbarment order, and no finding of moral turpitude was ever made.

he hit "something" and then drove away without stopping. While his earlier statements elucidated the relevant facts a bit more fully, they contained little or no material information that was not also included in his testimony before the hearing committee. Furthermore, as an attorney Mr. Tidwell should have known that his comments in court could have been used against him later. *See, e.g., Johnson v. Leuthongchak,* 772 A.2d 249, 250 (D.C. 2001) (guilty pleas are generally accepted as admissions in subsequent proceedings). His contention to the contrary is essentially frivolous.

### III. THE POSSIBILITY OF A BLACKOUT

In urging the Board to reject the hearing committee report, Mr. Tidwell proffered evidence [12] which, in his view, would show that at the time of the accident he might have been suffering from an alcohol-induced blackout. Such a blackout, he maintained, would explain why he did not stop his car, render assistance, or report the accident to the authorities. Because this evidence was not presented to the hearing committee, the Board refused to consider it, ruling that Mr. Tidwell had not shown the "extraordinary circumstances" necessary for the consideration of evidence offered after the hearing had ended.[13] Mr. Tidwell argues that this evidence should have been considered by the Board and urges this court to take judicial notice of certain articles from medical journals on

the subject of blackouts. We are not persuaded.

First, even if the proffered evidence were to be considered, it does not show that Mr. Tidwell suffered a blackout on the night of the accident. At most, it raises a possibility that a blackout *may* have occurred at some undefined point that evening.[14] Moreover, any suggestion that Mr. Tidwell might have experienced a blackout is contradicted by his testimony at the hearing in which he admitted hitting "something" that night, as well as his statement during the plea hearing that he "hit a person with [his] vehicle."

■ Second, when Mr. Tidwell pleaded guilty to the felony of leaving the scene of a fatal accident, he admitted as a matter of law the elements of that offense and the underlying facts. *See In re Wolff,* 490 A.2d 1118, 1119 (D.C.1985), *adopted en banc,* 511 A.2d 1047 (D.C.1986) ("a guilty plea represents both a conviction of a crime and an admission by the accused of the underlying facts" (citation omitted)); *In re Colson,* 412 A.2d at 1164, 1167 (a valid guilty plea acts as "an admission of all material facts" and as "conclusive proof that the attorney did the underlying acts which constitute the crime"). Mr. Tidwell's current attempt to deny his knowledge of the incident by proffering evidence that suggests the possibility of a blackout is merely an effort to deny an element of the offense which he has already admitted.

---

12. The proffered evidence consisted of a letter from his therapist (dated more than a month after the hearing committee had filed its report), two articles from scientific journals on the subject of alcohol-induced blackouts, and other scientific materials.

13. Board on Professional Responsibility Rule 13.7 provides in part: "Review by the Board shall be limited to the evidence presented to the Hearing Committee, except in extraordi-

nary circumstances determined by the Board."

14. Indeed, Mr. Tidwell does not allege that he in fact suffered a blackout. In his brief he asserts only that he "could have experienced a blackout period" and, in the next sentence, that "it is likely that [he] did suffer a blackout ...." There was no evidence before the hearing committee to support such assertions.

Under *Wolff* and *Colson,* he cannot do that.

Finally, the Board quite properly refused to consider the proffered materials because they were both irrelevant and untimely, and because, in the words of the Board, they had "not been tested by the adversarial system" so as to establish their "trustworthiness." The Board explained its reasoning at some length in its report, and we find no reason to disagree with it.

## IV. SUBSTANTIAL EVIDENCE

■ In disciplinary cases, this court must accept the Board's findings "unless they are unsupported by substantial evidence . . . ." D.C. Bar Rule XI, § 9(g); *see also, e.g., In re Davenport,* 794 A.2d at 603. Mr. Tidwell's challenge to the Board's factual findings is essentially an assertion that, if the Board had interpreted the evidence in a light more favorable to him, a different outcome would result. Because the Board's decisions are given deference, and because its findings in this case are fully supported in the record, this argument is entirely without merit.[15] *See* D.C. Bar Rule XI, § 9(g); *accord, e.g., In re Arneja,* 790 A.2d 552, 555 (D.C.2002) (hearing committee and Board findings are entitled to deference).

In a claim typical of those advanced in his brief, Mr. Tidwell asserts that there was substantial evidence in the record that the police were looking for a green mini-van, and that this information justified his failure to contact the authorities immediately after the accident. However, while the identity of the vehicle involved may have been in question for a couple of days following the accident, Mr. Tidwell nevertheless testified that he knew he hit "something" on the night of August 17 and that he failed to stop after that "something" shattered his windshield. While alternative interpretations of the facts might have been possible, it is clear that both the hearing committee and the Board chose to discredit Mr. Tidwell's version of what happened, which they were fully entitled to do.[16] *See, e.g., In re Morrell,* 684 A.2d 361, 370–372 (D.C.1996) (the fact that there is evidence contrary to the Board's findings does not mean that those findings are unsupported by substantial evidence); *In re Micheel,* 610 A.2d 231, 234 (D.C.1992) (deference given to credibility findings).

Mr. Tidwell also contests the Board's finding that he paid for the drinks with his credit card on the night of August 17. He argues that this finding is not supported by substantial evidence because no credit card receipt was introduced into evidence, which means that the Board's finding is a misstatement of fact. Even if that were true, we cannot see how it could exonerate him, since the credit card receipt merely established that Mr. Tidwell was at the Audubon Room on August 17 some time

---

15. Furthermore, weighing against Mr. Tidwell's position is the fact that the hearing committee found his testimony in general to be "vague, inconsistent, and in the end, incredible." This finding was later adopted by the Board.

16. In the same vein, Mr. Tidwell attacks the Board's reliance on a statement he made to his secretary on the day after the accident that his car's windshield was cracked and was then being repaired. He asserts that he said only that the windshield was damaged, and

not that it was under repair. Because Mr. Tidwell disputes the content of the conversation, he maintains that a factual finding based on it cannot be supported by substantial evidence. The secretary's comments, however, were memorialized by a police officer and signed by the secretary subject to perjury, facts which enhance their credibility. Moreover, the hearing committee acted well within its authority when it chose to believe the secretary's recollection over that of Mr. Tidwell.

before the accident, which he did not dispute. Regardless of whether he paid for the drinks with a credit card, in cash, or not at all, his situation would be the same: Mr. Tidwell drank three whiskeys, then got into his car, struck and killed a bicyclist on the way home, and failed to stop afterwards. Any error by the Board, if there even was one (which seems doubtful),[17] was certainly harmless, since the issue of how the drinks were paid for is totally unrelated to whether Mr. Tidwell's conduct involved moral turpitude.[18]

## V. RULE 8.4(B)

■ Mr. Tidwell claims that the Board erred in finding that he violated Rule 8.4(b) of the District of Columbia Rules of Professional Conduct. He relies on many of the same arguments he made in asserting that his conduct did not involve moral turpitude, which are equally meritless in this context. By leaving the scene of an accident and failing to report it to the authorities, Mr. Tidwell's conduct violated Rule 8.4(b) because that criminal act, in the language of the rule, "reflect[ed] adversely on [his] honesty, trustworthiness, or fitness as a lawyer."

Mr. Tidwell asks this court to excuse his conduct because of his reliance on the initial police report that a green minivan was involved in the accident, which allowed him to conclude that he was not associated with Mr. Fruehauf's death. Again, this argument contradicts his own testimony in which he admitted knowing on the night of the accident that he hit something and failed to stop. He did not learn of the police search for a green minivan until the next day, August 18, so his reliance on that report, even if valid, does nothing to excuse his conduct on August 17.

In its discussion of Rule 8.4(b), the Board likened this case to *In re Souls*, 669 A.2d 532 (R.I.1996), which according to the Board involved "a remarkably similar set of facts." In *Souls* an attorney pleaded *nolo contendere* to a charge of leaving the scene of a fatal accident. The attorney, while driving home after drinking "three or four beers," struck and killed a fifteen-year-old boy who was walking on the side of the road. After the collision, which resulted in massive damage to the windshield, Mr. Souls stopped his car momentarily, but then drove home without getting out because he thought he had only hit a deer. Early the following morning Souls contacted his attorney, who in turn

17. During his testimony before the hearing committee, Mr. Tidwell admitted paying for each of his three drinks and leaving the Audubon Room sometime around 9:00 p.m. When pressed about exactly how much the drinks cost, he responded, "I don't remember the exact amount. Whatever the exhibit said." The exhibit to which he referred was not further identified, but we think it likely that it was the credit card receipt. But even if it was not, how he paid for the drinks is of no consequence whatever.

18. Mr. Tidwell also contends that his due process rights were violated because the charges filed by Bar Counsel do not "mesh" with the hearing committee's findings. This contention was never made before the hearing committee, and was not even raised before the Board until Mr. Tidwell mentioned it in a footnote in his "sur-reply" to Bar Counsel's motion to strike his brief, filed more than three months *after* the hearing committee had issued its report. In any event, the facts on which the allegation of moral turpitude was based were set forth in detail in Bar Counsel's specification of charges, which was filed several months before the evidentiary hearing. That specification made clear that the charge of moral turpitude was based on the facts of the offense, and the hearing committee based its finding of moral turpitude on those very facts. We therefore reject Mr. Tidwell's due process argument, both because it was untimely raised and because it is entirely without merit.

called the police to ask about "possible accidents" the previous night. When the attorney later told him that no accidents had been reported, Souls went back to the scene and discovered the victim's body. He asked his lawyer to notify the police and immediately surrendered to the authorities. Mr. Souls was held to have violated Rule 8.4(b) of the Rhode Island Rules of Professional Conduct (which is identical to the District of Columbia rule in all relevant respects) because he "knew he had been involved in a collision wherein he was required [by state law] to stop ... and render reasonable aid" to any possible victim, but instead "left the scene without [conducting] a diligent search" for a possible victim. 669 A.2d at 533–534. Except for a few details, that is almost exactly what Mr. Tidwell did here. Even though *Souls* is not a District of Columbia case, we agree with the Board that it is a persuasive precedent.

The Board concluded that Mr. Tidwell's knowing failure to stop and notify the authorities after being involved in an accident reflected poorly on his honesty, trustworthiness, and fitness as an attorney, in violation of Rule 8.4(b). That ruling was well supported by the evidence and was patently correct.

## VI. SANCTION

Throughout his brief Mr. Tidwell contends that the sanction of disbarment is excessive and not representative of sanctions imposed in similar cases. Relying on cases such as *In re Hoare, In re Reynolds,* and *In re Small,* all cited earlier in this opinion, and emphasizing his "unblemished legal career," Mr. Tidwell argues that he should be spared from the severe sanction of disbarment. The cases cited by Mr. Tidwell, however, are distinguishable, as we have already explained at pages 12–14 of this opinion. In addition, because Mr.

Tidwell's conduct involved moral turpitude on its facts, disbarment is mandatory under D.C.Code § 11–2503(a). *See In re Hopmayer, supra* note 10, 625 A.2d at 292; *see also In re Rosenbleet,* 592 A.2d 1036, 1037 n. 3 (D.C.1991) (distinguishing between "ordinary" disbarment and disbarment under section 11–2503(a)). Furthermore, even absent the finding of moral turpitude, Mr. Tidwell's violation of Rule 8.4(b) supports the recommendation of disbarment. *See In re Pierson,* 690 A.2d 941, 947–948 (D.C.1997) (disbarment ordered for misappropriation of client funds in violation of Rule 8.4(b)); *In re Gil,* 656 A.2d 303, 304–305 (D.C.1995) (disbarment ordered for conduct which "amounted to larceny" in violation of Rule 8.4(b)); *see also In re Souls,* 669 A.2d at 534.

Mr. Tidwell also argues that because his offense of leaving the scene of an accident would be considered a misdemeanor in this jurisdiction, any sanction that we impose should reflect that fact. We reject this argument because Mr. Tidwell's ultimate charge was the result of a plea bargain with the Erie County District Attorney's Office. Any suggestion that the same charge would have been filed if his conduct had occurred in the District of Columbia is pure speculation, since we cannot assume that the United States Attorney's Office for the District of Columbia would have struck the same bargain. We note that negligent homicide, which involves "caus[ing] the death of another" by operating a vehicle "in a careless, reckless, or negligent manner," is a felony in the District of Columbia, punishable by five years in prison or a $5,000 fine, or both. *See* D.C.Code § 50–2203.01 (2001). Vehicular homicide may also be charged in appropriate cases as manslaughter, a thirty-year felony. D.C.Code § 22–2105 (2001); *see Hawkins v. United States,* 395 A.2d 45 (D.C.1978). In any event, we have held

that disbarment is appropriate even when an attorney is convicted of a mere misdemeanor if the facts underlying the conviction involved moral turpitude. *See In re Sneed*, 673 A.2d at 594.

## VII. CONCLUSION

It is therefore ORDERED that Drew V. Tidwell is hereby disbarred from the practice of law in the District of Columbia, effective immediately. We direct Mr. Tidwell's attention to the requirements of Rule XI, §§ 14(g) and (h) and 16(c), and their effect on his eligibility for reinstatement.