In re Adrian P. IFILL, Respondent.

A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 192864).

Nos. 02–BG–1264, 03–BG–1487.

District of Columbia Court of Appeals.

Submitted May 23, 2005.

Decided June 16, 2005.

---

Adrian P. Ifill, pro se.

Joyce E. Peters, Bar Counsel at the time the brief was filed, and Julia L. Porter, Senior Assistant Bar Counsel, for the Office of Bar Counsel, in No. 02–BG–1264.

Wallace E. Shipp, Jr., Acting Bar Counsel at the time the brief was filed, and Julia L. Porter, Senior Assistant Bar Counsel, for the Office of Bar Counsel in No. 03–BG–1487.

Before TERRY, REID and WASHINGTON, Associate Judges.

REID, Associate Judge:

Before us are consolidated disciplinary proceedings involving respondent Adrian P. Ifill, also known as Adrian Palmer Ifill.[1] One case is an original disciplinary proceeding commenced by the District of Columbia's Bar Counsel, and the other is a reciprocal discipline proceeding resulting from action taken by Maryland attorney disciplinary authorities. The District of Columbia Board on Professional Responsibility ("the Board" or "the BPR") has recommended as a sanction in the original disciplinary proceeding a one-year suspension, and restitution with interest as a condition of reinstatement. The Board recommends the identical reciprocal discipline of disbarment in the second case. We accept the Board's recommendations.

## FACTUAL SUMMARY

In No. 02–BG–1264 (Bar Docket Number ("BDN") 450–99), Bar Counsel initiated an original disciplinary proceeding based on the December 1999, complaint of Mrs. Cora Britton. Mr. Ifill was charged with violations of the following District of Columbia Rules of Professional Conduct: 1.3,[2] 1.4,[3] 1.5(a),[4] 1.5(b),[5] 8.1(a),[6] and 8.4(c).[7]

---

1. These cases were scheduled for oral argument on May 3, 2005, postponed at the request of Mr. Ifill, and rescheduled for May 23, 2005. When Mr. Ifill did not appear for the argument on May 23, the cases were submitted.

2. Rule 1.3 provides:

Similar or identical charges, in addition to different specifications, were filed by the Maryland Attorney Grievance Commission through Maryland's Bar Counsel in the second consolidated case, No. 03–BG–1487 (BDN 468–03), a reciprocal discipline case based in part on the Britton matter, and in part on Mr. Ifill's representation in a Maryland matter.[8] An evidentiary hearing on the District's original charges took place on March 15, 2001, before Hearing Committee No. 7, and the hearing on the merits of the Maryland charges occurred from January 6, 2003 to May 27, 2003.[9]

The District's Hearing Committee, which heard direct testimony from Mrs. Britton, Mr. Ifill and others, made factual findings in its January 3, 2002 Report, which the Board determined were supported by substantial record evidence. Those findings show that on a periodic basis prior to 1995, Mr. Ifill handled re-

(a) A lawyer shall represent a client zealously and diligently within the bounds of the law.

(b) A lawyer shall not intentionally:

(1) Fail to seek the lawful objectives of a client through reasonably available means permitted by law and the disciplinary rules; or

(2) Prejudice or damage a client during the course of the professional relationship.

(c) A lawyer shall act with reasonable promptness in representing a client.

3. Rule 1.4 specifies in pertinent part:

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation . . . .

4. Rule 1.5(a) states in part: "A lawyer's fee shall be reasonable."

5. Rule 1.5(b) reads: "When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, in writing, before or within a reasonable time after commencing the representation."

6. Rule 8.1(a) provides in relevant part:

[A] lawyer . . . in connection with a disciplinary matter, shall not:

(a) Knowingly make a false statement of material fact[.]

7. Rule 8.4(c) specifies:

It is professional misconduct for a lawyer to:

. . . .

(c) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation[.]

8. With respect to the Britton matter, based on initial action taken by the District, Maryland charged violations of the following Maryland Rules of Professional Conduct:

Rule 1.1 relating to competent representation of a client;

Rule 1.3 requiring a lawyer to "act with reasonable diligence and promptness in representing a client";

Rule 1.4 (a) mandating that a client be kept "reasonably informed about the status of a matter" and that the attorney "promptly comply with reasonable requests for information";

Rule 1.4 (b) specifying that a lawyer "shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation";

Rule 1.5 (a) stating that "[a] lawyer's fee shall be reasonable," and setting forth the factors governing reasonableness;

Rule 1.5 (b) requiring a lawyer who has not regularly represented a client to set forth "the basis or rate of the fee . . . , preferably in writing, before or within a reasonable time after commencing the representation";

Rule 8.1 (a) prohibiting a lawyer involved in a disciplinary matter from "knowingly mak[ing] a false statement of material fact";

Rule 8.4 (c) precluding a lawyer from "engag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation;" and

Rule 8.4 (d) prohibiting a lawyer from "engag[ing] in conduct that is prejudicial to the administration of justice[.]"

9. The hearing was postponed more than once due, in part, to Mr. Ifill's emergency surgery, followed by a period of recuperation.

quests for legal assistance from the Britton family, primarily Mr. Britton. After Mr. Britton died in debt, Mrs. Britton sought to collect the assets of his estate, and to pay off his debts. With the help of Mr. Britton's former employer, the United States Postal Service, Mrs. Britton received $212,000.00 in proceeds from her husband's insurance policy, as well as monthly annuity benefits. She used some of the insurance money to pay Mr. Britton's debts, and made gifts to family members. Because Mrs. Britton discovered that some of Mr. Britton's debts were paid from credit life insurance policies that covered certain of Mr. Britton's credit card and other debts, she thought that there might be other insurance assets belonging to Mr. Britton's estate. Therefore, she arranged a meeting with Mr. Ifill.

Mrs. Britton's meeting with Mr. Ifill took place in early October 1995. Mrs. Britton recounted what had been done up to that point regarding Mr. Britton's estate, and indicated that she had received $212,000.00 in insurance benefits as well as monthly annuity payments. She asked Mr. Ifill to represent her with regard to two discrete matters: (1) an effort to ascertain whether her husband's estate was entitled to other insurance payments, and (2) assistance in completing a two-page income tax election form. Mr. Ifill charged $35.00 to complete the tax form, but did not discuss his fee for the first task; nor did he execute a retainer agreement with Mrs. Britton.

Less than a week after the October 1995 meeting, Mr. Ifill requested $5,000.00 from Mrs. Britton to file four insurance claims. Mrs. Britton sent him a check for $5,000.00. In November 1995, Mrs. Britton agreed to pay Mr. Ifill an additional $5,000.00; Mr. Ifill personally picked the check up from Mrs. Britton on November 9, 1995. Despite Mrs. Britton's request at that time for a retainer agreement, or written acknowledgment of her payment of $10,000.00, Mr. Ifill never presented a retainer agreement to Mrs. Britton, nor any other written acknowledgment of her payments. He again approached Mrs. Britton for money around the 23rd of November 1995; by telephone, he asked for $15,000.00, telling her she "would not 'hardly even miss this money'" because she was entitled to "a lot of money ... from the insurance companies." Mrs. Britton refused to give Mr. Ifill any more money.

Over the next several months, Mr. Ifill did not pursue the insurance matter. Mrs. Britton was unable to communicate with him; her efforts to reach him by telephone either failed, or he cut the conversation quickly by saying he would call her back. In May 1996, Mr. Ifill wrote several letters pertaining to the quest for additional insurance funds. Within the month he received word in response to all of his letters, indicating that Mrs. Britton was due no further funds on Mr. Britton's credit life insurance policies. Mr. Ifill did not relay these responses to Mrs. Britton; her attempts to reach him between May 1996 and May 1997 were futile. Although she made voice contact with him in early June, he was non-responsive to her inquiries. Mrs. Britton demanded her money back, but Mr. Ifill hung up on her.

On July 2, 1997, Mr. Ifill wrote to Mrs. Britton. In his letter he apologized for the delay, promised to pursue the matter "vigorously," and stated that he was enclosing three checks from insurance companies. No such checks were included in the letter, and the letter in fact never was sent. Instead, Mr. Ifill returned a few checks in small amounts to insurance companies, claimed that they were "stale" and requested that the checks be reissued.

In September 1999, Mrs. Britton retained new counsel who contacted Mr. Ifill twice before receiving a response and the files in Mrs. Britton's case. Mr. Ifill promised to send Mrs. Britton an itemized statement of his services. No such statement was ever sent, but both new counsel and Mrs. Britton received copies of documents pertaining to Mrs. Britton's case from Mr. Ifill's files. Upon receiving this information, Mrs. Britton realized she had no further claims against the insurance companies. She then informed Mr. Ifill that he could keep $1,000.00 of the fees she had paid to cover the cost of the letters he had written, but she demanded the return of $9,000.00. Mr. Ifill did not return the $9,000.00 sum.

Based upon the Hearing Committee's factual findings, which the Board determined were supported by substantial record evidence, the BPR concluded in its November 12, 2002 Report that Mr. Ifill violated all of the rules set forth in the specification of charges.[10] Specifically, he violated Rule 1.3 in failing to pursue Mrs. Britton's claims zealously, diligently and promptly; and failing to seek the lawful objectives of the client; Rule 1.4 when he failed to keep Mrs. Britton reasonably informed about her case and further failed to explain that she had no viable claims against her husband's insurers; Rule 1.5(a) in charging unreasonable fees for a minimal amount of work; Rule 1.5(b) in failing to provide Mrs. Britton with a written fee agreement; Rule 8.1(a) by making several false statements to Bar Counsel; Rule 8.4(c) by misrepresenting to Mrs. Britton that she had viable claims against the insurers, and submitting false statements to Bar Counsel in connection with the disciplinary proceedings. The Board

rejected Mr. Ifill's contentions regarding the fairness of the process, specifically his claim that he was denied access to original documents in Bar Counsel's possession and that a member of the Hearing Committee had prejudged his case. The Board recommended suspension for one year, and "full restitution with interest at the legal rate as a condition of reinstatement." Mr. Ifill filed exceptions to the Board's Report and Recommendation.

The second consolidated case, No. 03–BG–1487 (BDN 468–03), is a reciprocal discipline proceeding. On July 15, 2002, the Maryland Grievance Commission, through the Maryland Bar Counsel, filed a Petition for Disciplinary Action against Mr. Ifill in the Court of Appeals of Maryland. The Petition charged Mr. Ifill with multiple violations of the Maryland Rules of Professional Conduct based on two separate legal matters handled by him, one pertaining to the Britton complaint that is the subject of the original proceeding in No. 02–BG–1264; and the other to a complaint in the estate proceeding of decedent John Ceasar in the Orphans' Court for Prince George's County, Maryland. The Court of Appeals of Maryland designated Circuit Judge Sean D. Wallace to conduct a hearing on the Petition. The hearing was held between January 6, 2003, and May 27, 2003, after which Judge Wallace made findings of fact and conclusions of law.

The record shows that Judge Wallace's factual findings pertaining to the Britton matter were substantially the same as those made by the District's Hearing Committee. With respect to the Ceasar matter, the record reveals that while the scenario between Mr. Ifill and Mrs. Britton was unfolding, Mr. Ifill agreed to repre-

---

10. Although the Hearing Committee considered false statements made during the disciplinary process to be charged properly under Rule 8.1, the Board determined that they were also properly charged under Rule 8.4(c).

sent Mrs. Gladys James, the Personal Representative of her brother's estate, the Estate of John Ceasar, in Prince George's County, Maryland. Mr. Ifill was retained in 1998 and was paid a retainer fee of $2,500.00.

Mrs. James and her brother were tenants in common with respect to property in Capitol Heights, Maryland. After his death, she mortgaged the property, paid Mr. Ifill an additional $5,000.00, and deposited $55,609.15 in an estate account. The deposit amount included proceeds from the mortgage, as well as other checks payable to Mr. Ceasar's estate. Mr. Ifill was a signatory on the estate account. In late October 1998, without Mrs. James' knowledge and without the approval of the Maryland Orphans' Court, Mr. Ifill wrote checks in the amount of $4,000.00 and $12,000.00 to himself. In late November 1998, again without the knowledge of Mrs. James or the approval of the Orphans' Court, he wrote an additional $5,000.00 check to himself. The proceeds from these three checks were placed in his personal account. Upon learning about Mr. Ifill's actions, Mrs. James contacted him. He claimed that he had borrowed the money and would return it. After returning $21,000.00 to Mrs. James in February 1999, Mr. Ifill filed a Petition with the Orphans' Court for fees amounting to $7,500.00. The Orphans' Court paid Mr. Ifill $2,500.00 and referred the matter to the Maryland Attorney Grievance Committee for investigation.

Judge Wallace disbelieved Mr. Ifill's explanation concerning the checks he wrote without authority. The judge especially discredited Mr. Ifill's narrative regarding the $12,000.00 check, which Mr. Ifill maintained was written at Mrs. James' request to facilitate a loan to a Mr. Muhammad, one of Mr. Ifill's clients who allegedly was a theology student in Saudi Arabia. Mr. Ifill did not know where Mr. Muhammad resided in that country. Nor did Mr. Ifill obtain a promissory note from Mr. Muhammad. Mr. Ifill claimed that after Mrs. James demanded repayment of the $12,000.00, a man clothed in Muslim attire, whose name Mr. Ifill did not know, brought him $12,000.00 in cash to repay Mrs. James. Judge Wallace "[found] this fantastical explanation, with its mysterious and exotic characters to be false."

Judge Wallace concluded that the evidence presented substantiated the charges against Mr. Ifill. The judge determined that Mr. Ifill violated Maryland Rule 1.15(a)[11] in that he took funds that did not belong to him and placed them in his personal account; Rule 8.1(a)[12] by making false statements to Maryland Bar Counsel and the Court during the disciplinary proceeding; and Rules 8.4(a), (b), (c), and (d)[13] "by misappropriating funds, taking a fee for work on the estate without prior

11. Rule 1.15(a) of the Maryland Rules of Professional Conduct states in relevant part:

> A lawyer shall hold property of clients . . . that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded
> . . . .

12. See note 8, *supra.*

13. Maryland Rules 8.4(a) and (b) provide in pertinent part:

> It is professional misconduct for a lawyer to:
> (a) violate or attempt to violate the Rules of Professional Conduct, . . .;
> (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects . . . .

For Maryland Rules 8.4(c) and (d), see note 8, *supra.*

approval of the Orphans' Court, and giving false statements and testimony to cover up the misappropriation." In addition, Judge Wallace concluded that Mr. Ifill violated Maryland Rule 16–604 concerning the handling of funds belonging to a client.[14]

The Court of Appeals of Maryland reviewed Judge Wallace's conclusions *de novo*, and his factual findings to determine whether they were based on clear and convincing evidence. In addition, the Court reviewed in excess of ninety pages filed by Mr. Ifill, including numerous exceptions to Judge Wallace's findings and conclusions. After its review, the Court of Appeals sustained virtually all of Judge Wallace's findings and conclusions, rejecting substantially all of Mr. Ifill's exceptions. For example, the Court concluded that Judge Wallace properly admitted into evidence the April 2001 telephone testimony of Mrs. James before a Maryland Attorney Grievance Commission Inquiry Panel hearing which Mr. Ifill attended and thus had an opportunity to cross-examine Mrs. James. At the time, Mrs. James was a resident of Trinidad and could not have been compelled to return to Prince George's County for the hearing. In its December 18, 2003 unpublished opinion, the Court decided that the appropriate sanction was disbarment:

> We conclude that the appropriate sanction for [Mr.] Ifill's ethical violations is disbarment. It warrants repeating that the misappropriation of client funds and flagrant deceitful conduct will not be tolerated. [Mr.] Ifill gouged Ms. Britton, his client, for a fee and then lied about it. He misappropriated funds from the Ceasar estate and, again, lied about it. We find that [Mr.] Ifill's predatory violations establish a pattern of deceitful conduct and mendacity unbecoming a member of the legal profession. [Mr.] Ifill failed competently and diligently to represent his clients, failed to communicate with his clients regarding the status of their cases, charged a client $10,000 to pursue frivolous claims and then did not pursue them at all, took funds that did not belong to him and placed them in his general account, took a fee for work on the estate without prior approval of the Orphans' Court, misappropriated funds, and was dishonest during the Commission's investigatory process. [Mr.] Ifill's failure to acknowledge any wrongdoing in his behavior indicates a likelihood to us that he will continue to engage in such a pattern to the detriment of future clients, unless we act.

Subsequently, on January 28, 2004, at the request of Bar Counsel, this court imposed an interim suspension on Mr. Ifill, and within two days, Bar Counsel filed a statement supporting reciprocal discipline. Later, on April 22, 2004, Mr. Ifill was disbarred by the United States Court of Appeals for the District of Columbia Circuit, based on his disbarment in Maryland. And, in its Report and Recommendation of September 29, 2004, the BPR reviewed exceptions filed by Mr. Ifill to the Hearing Committee's Report, determined that they were "inapplicable" and recommended the identical reciprocal discipline of disbar-

14. Maryland Rule 16–604 specifies in relevant part:

Except as otherwise permitted by rule or other law, all funds, including cash, received and accepted by an attorney or law firm in this State from a client or third person to be delivered in whole or in part to a client or third person, unless received as payment of fees owed the attorney by the client or in reimbursement for expenses properly advanced on behalf of the client, shall be deposited in an attorney trust account in an approved financial institution . . . .

ment based on Mr. Ifill's misappropriation in the Ceasar matter.

## ANALYSIS

In his brief regarding the reciprocal disciplinary matter, Mr. Ifill fails to demonstrate by clear and convincing evidence that the reciprocal discipline proceeding falls under any of the exceptions set forth in D.C. Bar Rule XI, § 11(c)(1) through (5). Rather, he gives his view of the process in Maryland, generally attacking the credibility of Mrs. Britton, faulting the Maryland courts for their rulings, and the BPR for failing to hold a hearing in the reciprocal discipline matter. His brief concerning the original disciplinary proceeding is devoted in large measure (45 pages) to Mr. Ifill's version of what happened in the case, and his legal argument (4 pages) focuses on the alleged "lies" of Mrs. Britton, alleged Hearing Committee misrepresentations of the record, the need for expert testimony regarding a fire in Mr. Ifill's office and the burning of some of his records, the alleged absence of substantial record evidence, and the treatment of his motion to dismiss after a Hearing Committee member allegedly expressed his opinion following Mrs. Britton's direct testimony.

With regard to the reciprocal proceeding, the Board maintains that Mr. Ifill has failed to show any applicable exception under Rule XI, § 11(c). In addition, the Board argues that clear and convincing evidence supports the findings and conclusions of the Maryland courts. The Board contends in the matter of the original proceeding that the Hearing Committee found Mrs. Britton's testimony credible but discredited that of Mr. Ifill, and further, that there was substantial record evidence to support the Committee's findings and conclusions. Furthermore, the Board asserts that the due process contentions of Mr. Ifill are without a foundation in the record, and that the evidence supports the sanction of a one-year suspension, with reinstatement conditioned upon full restitution.

"Under Rule XI, § 11(c) of this court's Rules Governing the Bar, 'reciprocal discipline shall be imposed unless the attorney demonstrates, by clear and convincing evidence,' that the case falls within one or more of five specifically enumerated exceptions." *In re Zilberberg*, 612 A.2d 832, 834 (D.C.1992). These exceptions are:

(1) The procedure elsewhere was so lacking in notice or opportunity to be heard as to constitute deprivation of due process; or

(2) There was such infirmity of proof establishing the misconduct as to give rise to the clear conviction that the Court could not, consistently with its duty, accept as final the conclusion on that subject; or

(3) The imposition of the same discipline by the Court would result in grave injustice; or

(4) The misconduct established warrants substantially different discipline in the District of Columbia; or

(5) The misconduct elsewhere does not constitute misconduct in the District of Columbia.

D.C. Bar Rule XI, § 11(c)(1)-(5). "The rule ... creates a rebuttable presumption that the discipline will be the same in the District of Columbia as it was in the original disciplining jurisdiction." *Zilberberg, supra*, 612 A.2d at 834 (footnote and citation omitted). Thus,

Unless there is a finding by the Board under [Rule 11(c)] (1), (2), or (5) ... that is accepted by the Court, a final determination by a disciplining court outside the District of Columbia or by another court in the District of Columbia that an attorney has been guilty of professional

misconduct shall conclusively establish the misconduct for the purpose of a reciprocal disciplinary proceeding in this Court.

D.C. Bar Rule XI, § 11(c).

■ With respect to an original disciplinary proceeding in the District of Columbia, "this court will accept the Board's findings of fact if they are supported by substantial evidence." *In re Tidwell,* 831 A.2d 953, 957 (D.C.2003) (citing *In re Davenport,* 794 A.2d 602, 603 (D.C.2002)); *see generally* D.C. Bar Rule XI, § 9(g). "In addition, the court will adopt the Board's recommended sanction 'unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted.'" *Tidwell, supra,* 831 A.2d at 957 (quoting D.C. Bar Rule XI (g)(1) and citing *In re Spiridon,* 755 A.2d 463, 468 (D.C.2000)).

■ Our review of Mr. Ifill's brief in the reciprocal disciplinary matter reveals no effort on his part to establish by clear and convincing evidence that any of the exceptions set forth in D.C. Bar Rule XI, § 11(c) are applicable. Instead, he launches a general attack on the proceedings in Maryland, and the Board's Report and Recommendation. The record demonstrates that the process in Maryland afforded him notice and an opportunity to be heard during the evidentiary proceedings before Circuit Court Judge Wallace, which were postponed to take into account Mr. Ifill's surgery and recuperation in 2003.[15] In addition, the Court of Appeals of Maryland reviewed Judge Wallace's conclusions *de novo,* and carefully considered Mr. Ifill's exceptions to Judge Wallace's findings. Therefore, although Mr. Ifill complains that he was not provided a *de novo* hearing with respect to the Britton matter before his interim suspension and that "[a] hearing is required in the District of Columbia when there are issues raised regarding reciprocal discipline," he was not entitled to yet another hearing. Not only did he have a hearing in Maryland that met the requirements of due process, but the Hearing Committee in the District of Columbia conducted an evidentiary hearing during its original proceeding in the Britton matter; both Mrs. Britton and Mr. Ifill, as well as others, testified during that hearing. With respect to the Ceasar matter, Mr. Ifill had an opportunity to cross-examine Mrs. James when she gave the telephonic testimony during a Maryland Grievance Commission Inquiry Panel hearing in April 2001, that was admitted into evidence by Judge Wallace. Moreover, although Mr. Ifill persists in his argument that Bar Counsel deprived him of access to his original documents in the Britton matter, his contentions concerning his access to records, including those allegedly destroyed by fire, were addressed and rejected by Bar Counsel, the Board and the Maryland Court. In short, on this record we see no deprivation of due process; Mr. Ifill received all the process that he was due. Hence, he cannot satisfy the exception in § 11(c)(1).[16]

15. Although he maintains that his health interfered with his effective self-representation, the record shows no complaint by Mr. Ifill when the proceedings before Judge Wallace resumed after his surgery and recuperation. *See In re Zdravkovich,* 831 A.2d 964, 969 (D.C.2003). And, the Maryland court rejected his motion for a stay of publication, for that reason, after its decision was handed down.

16. We discern no credible evidence in the record to substantiate Mr. Ifill's claim that he was denied the equal protection of the laws during the Maryland process. Nor do we see anything in the record to support his sweeping statements that "[t]he proceedings before the [Maryland] Circuit Court [were] conducted in an acrimonious atmosphere," and that "the Circuit Court bent over backwards to intentionally prejudice the case against [him]

■ Nor are Mr. Ifill's general statements of complaint sufficient to establish by clear and convincing evidence "infirmity of proof" within the meaning of § 11(c)(2). Indeed, the Maryland Bar Counsel presented substantial and extensive proof of Mr. Ifill's deplorable misconduct, both with respect to the Britton and the Ceasar matters, during the evidentiary hearing before Judge Wallace. In light of the credibility determinations made by Judge Wallace, the solid, credible evidence presented, and the reasonable inferences drawn therefrom, there is no doubt that Mr. Ifill misappropriated monies from the Ceasar Estate by writing three checks to himself in the amount of $4,000.00, $12,000.00, and $5,000.00, without the knowledge of Mrs. James, the Personal Representative of Mr. Ceasar's estate, and without the approval of the Maryland Orphans' Court, and by depositing the proceeds from those estate fund checks into his personal account. Furthermore, based on the record in the Maryland courts, substantial evidence exists that Mr. Ifill not only demanded legal fees from Mrs. Britton on three different occasions, in the amount of $5,000.00, $5,000.00, and $15,000.00 for making frivolous insurance claims, but that he actually pocketed, and retains to this day, $10,000.00 which Mrs. Britton paid for minimal, indeed virtually no work. And, given Judge Wallace's credibility determinations, there is substantial evidence in the record that Mr. Ifill manifested dishonesty by making false statements to the Maryland Bar Counsel and the Maryland court during the Maryland proceedings. This misconduct found in both the Ceasar and Britton matters in Maryland is recognized as misconduct in the District of Columbia; thus the exception in 11(c)(5) is not available to Mr. Ifill.

■ Nor would imposition of the same discipline in the District as in Maryland result in grave injustice under Rule 11(c)(3). Indeed under the circumstances of the Ceasar estate matter alone, involving misappropriation of client funds and dishonesty, this jurisdiction would have disbarred Mr. Ifill in an original proceeding.[17] *See In re Berryman,* 764 A.2d 760, 768 (D.C.2000) ("Misappropriation is any unauthorized use of client's funds entrusted to [a lawyer], including not only stealing but also unauthorized temporary use for the lawyer's own purpose, whether or not [he] derives any personal gain or benefit therefrom.") (citations and internal quotation marks omitted); *In re Addams,* 579 A.2d 190, 191 (D.C.1990) (en banc) ("[I]n virtually all cases of misappropriation, disbarment will be the only appropriate action unless it appears that the misconduct resulted from nothing more than simple negligence."). Consequently, we accept the Board's recommendation and impose the sanction of disbarment on Mr. Ifill, that is, identical reciprocal discipline, in No. 02–BG–1487 (BDN 468–03).

■ Even though we have imposed the ultimate sanction of disbarment in No.

by making erroneous rulings to favor Bar Counsel." And his contention that the funds involved in the Ceasar estate matter were not estate funds was addressed by the Court of Appeals of Maryland which relied on the credited testimony of Mrs. James. Furthermore, the Court of Appeals of Maryland decided, under Maryland law, that the testimony of Mrs. James before the Maryland Attorney Grievance Commission Inquiry Panel was properly admitted into evidence during the disciplinary proceeding. We see no basis on which to disturb this interpretation of Maryland law by the highest court of Maryland.

17. We are unpersuaded by Mr. Ifill's argument that "[t]he Maryland Court of Appeals considered two matters and returned one sanction for both matters," since the facts and circumstances of the Ceasar matter alone merited the sanction of disbarment.

03–BG–1487, we nevertheless turn to the original disciplinary proceeding in No. 02–BG–1264 since the matter is before us and contains a recommendation for restitution. We accept the Board's recommendation of a one-year suspension, and "full restitution with interest at the legal rate as a condition of reinstatement." The Board adopted the Hearing Committee's factual findings in that matter, and we also see no reason to disturb those findings. The Hearing Committee examined Mr. Ifill's allegation that he performed legal work for Mrs. Britton and that the $10,000.00 fee was reasonable for that work. The Committee discredited his explanation. Credibility determinations, as well as the "weight, value and effect of the evidence," fall within the province of the factfinder. *In re Temple*, 629 A.2d 1203, 1208 (D.C. 1993). The testimony of Mrs. Britton, the implausibility of Mr. Ifill's testimony and the Hearing Committee's decision to discredit it, and the absence of any credible evidence supporting the existence of a retainer agreement between Mrs. Britton and Mr. Ifill are all more than sufficient to support the Hearing Committee's findings and the Board's Report. Clearly, Mr. Ifill did not provide zealous, diligent and prompt representation; nor did he keep Mrs. Britton reasonably informed about her case; nor did he explain that she had no more non-frivolous claims against her husband's insurers. Instead, he dodged her inquiries repeatedly about the substance of her claims and her request for written confirmation of the $10,000.00 paid to him. In addition, he callously demanded money from her on three different occasions, telling her once that she "would not 'hardly even miss the money'" because she was entitled to "a lot of money … from the insurance companies." Yet, he knew full well that he had no indication of remaining viable claims against Mr. Britton's insurers.

Only one other of Mr. Ifill's arguments regarding the original disciplinary proceeding warrants any comment. He declares that he was denied a fair hearing because one of the members of the Hearing Committee "ma[d]e up his mind on [his] case before the case ha[d] ended." Specifically, Mr. Ifill points out that during a break in the hearing, one of the committee members asked the Committee Chair if the District of Columbia Bar maintains a fund for "abused" clients. That comment, by itself, would not constitute prejudgment. *See In re Bell*, 373 A.2d 232, 233 (D.C.1977) ("[T]o be disqualifying, the alleged bias and prejudice 'must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case.'") (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)). In short, we see no basis for rejecting the Board's Report and Recommendation in the original proceeding, and thus accept the Board's recommendation of sanction. As Bar Counsel indicates, Mr. Ifill's misconduct merits a greater sanction than the nine months imposed in *In re Bernstein*, 774 A.2d 309 (D.C.2001), because his conduct is more egregious than that of Mr. Bernstein. Therefore, we conclude that the sanction of a one-year suspension, with restitution would not "foster a tendency toward inconsistent dispositions for comparable conduct," and the recommended sanction certainly is warranted.

Accordingly, for the foregoing reasons it is hereby

ORDERED that in No. 03–BG–1487 (BDN 468–03), Adrian P. Ifill, also known as Adrian Palmer Ifill, is disbarred from the practice of law in the District of Columbia. Moreover, since he has not filed the affidavit required by D.C. Bar Rule XI, § 14(g), we direct his attention to the

requirements of that rule and their effect on his eligibility for reinstatement. *See* D.C. Bar Rule XI, § 16(c).

FURTHER ORDERED that in No. 02–BG–1264 (BDN 450–99), Mr. Ifill is suspended for a period of one year, with full restitution in the amount of $10,000.00 with interest at the legal rate beginning no later than November 9, 1995, as a condition of reinstatement.

*So ordered.*