*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 05-BG-1141

IN RE WAYNE R. ROHDE, RESPONDENT

A Member of the Bar of the
District of Columbia Court of Appeals
(Bar Registration No. 421213)

On Report and Recommendation
of the Board on Professional Responsibility
(BDN-D347-05)

(Argued October 11, 2016                     Decided August 30, 2018)

*Timothy J. Simeone*, with whom *Thomas B. Mason* and *John R. Grimm* were on the brief, for respondent.

*Jennifer P. Lyman*, Senior Assistant Disciplinary Counsel, with whom *Wallace E. Shipp, Jr.*, Disciplinary Counsel at the time the brief was filed, *Jelani Lowery*, Senior Staff Attorney, and *Joseph N. Bowman*, Assistant Disciplinary Counsel, were on the brief, for the Office of Disciplinary Counsel.

Before EASTERLY and MCLEESE, Associate Judges, and WASHINGTON, *Senior Judge,*[*]

_____

[*] Judge Washington was Chief Judge at the time of argument. His status changed to Senior Judge on March 20, 2017.

Opinion for the court by *Associate Judge* EASTERLY.

Concurring opinion by *Associate Judge* MCLEESE at page 34.

EASTERLY, *Associate Judge*:  Respondent, Wayne R. Rohde, was convicted over a decade ago in Virginia of "leaving the scene of an accident,"[1] a felony.  The Board on Professional Responsibility ("the Board") has determined that Mr. Rohde committed both a "serious crime," under D.C. Bar R. XI section 10 (b) and violated Rule 8.4 (b) of the Rules of Professional Conduct by committing "a criminal act that reflects adversely on [his] . . . fitness as a lawyer."  As a sanction, the Board recommends a two-year suspension from the practice of law, with a fitness requirement, stayed in favor of three years of probation with conditions.  Mr. Rohde has not contested either the Board's assessment of his misconduct or its recommended sanction.  Disciplinary Counsel, however, argues that the Board's recommended sanction is inadequate.  Specifically, Disciplinary Counsel argues that because Mr. Rohde's crime involved moral turpitude, either per se or on the facts, Mr. Rohde must be disbarred per D.C. Code § 11-2503 (a) (2012 Repl.).  Alternatively, Disciplinary Counsel argues that this court should disregard Mr.

---

[1]  Va. Code § 46.2-894 (2005).

Rohde's *Kersey*[2] mitigation evidence (which it argues should not be considered in a disciplinary case based on a felony conviction) and exercise its discretion to disbar Mr. Rohde.

This court employs three distinct analyses to evaluate a bar discipline case based on a criminal conviction. We begin with an element-focused inquiry to assess if the crime is one of moral turpitude per se. If it is not, we then refocus the inquiry to assess the facts and circumstances that fairly bear on the question of moral turpitude in the actual commission of the crime, such as motive or mental condition. If the crime is not one of moral turpitude, either per se or on the facts, we then conduct a comprehensive analysis of the totality of the circumstances, including any aggravating and mitigating factors, and exercise our discretion to impose a just sanction.

Applying this rubric to Mr. Rohde's case, we conclude, based on an examination of the crime's elements, that his conviction under Virginia law for leaving the scene of an accident without complying with reporting requirements or rendering aid to the person whose car he hit does not meet the stringent test for

---

[2] *In re Kersey*, 520 A.2d 321 (D.C. 1987).

moral turpitude per se. We further conclude that Mr. Rohde's offense was not one of moral turpitude on the facts, relying on the undisputed evidence that Mr. Rohde was in an alcoholic blackout during its commission and the credited expert testimony that he was unable to exercise appropriate judgment while in that condition. Lastly, we exercise our discretion as to the appropriate sanction. Considering the totality of the circumstances, we acknowledge the gravity of Mr. Rohde's conduct as well as his previous pattern of drinking and driving, but we also look to his powerful *Kersey* mitigation evidence (which we hold is properly considered in cases involving a felony conviction but not reflecting moral turpitude). Specifically, Mr. Rohde demonstrated that at the time he committed this crime he was suffering from alcoholism, that he subsequently sought treatment, and that he has now been in recovery for many years. In light of Mr. Rohde's rehabilitation and the distinct function of the disciplinary system not to punish but "to maintain the integrity of the [legal] profession . . . to protect the public and the courts, [and] to deter other attorneys from engaging in similar misconduct," *In re Reback*, 513 A.2d 226, 231 (D.C. 1986) (en banc), we see no utility in disbarring or actively suspending Mr. Rodhe and thus adopt the Board's recommended sanction.

## I.  Facts and Procedural History

On October 20, 2004, Mr. Rohde went out drinking after work with friends. After consuming a large quantity of alcohol, he drove home to northern Virginia. On his way home, he collided head-on with another car. The other car was totaled and his car sustained significant front-end damage. The other driver, Ms. Banks, was severely injured. Mr. Rohde did not stop. Instead, he drove four or five blocks home on a flat front tire and an exposed rim, causing sparks to fly. He parked his car in the driveway of his house and went inside. He did not respond to the police who, having found Mr. Rohde's license plate at the scene, came to his house some time later that evening, banged on his door for 20-30 minutes, and towed his damaged car away. He did not respond to a phone call from his friend and neighbor, Joshua Horowitz.

After speaking to Mr. Horowitz the following morning, Mr. Rohde contacted counsel and turned himself in to the police. He was indicted on one count of felony leaving the scene of an accident, Va. Code § 46.2-894 (2005), which requires

> The driver of any vehicle involved in an accident in which a
> person is killed or injured or in which an attended vehicle or

> other attended property is damaged shall immediately stop. . . and report his name, address, driver's license number, and vehicle registration number forthwith to . . . law[] enforcement . . ., to the person struck and injured if such person appears to be capable of understanding and retaining the information, or to the driver or some other occupant of the vehicle collided with or to the custodian of other damaged property. The driver shall also render reasonable assistance to any person injured in such accident . . . .[3]

He pled guilty to the indictment and timely reported his conviction to Disciplinary Counsel and this court.

Mr. Rohde and Disciplinary Counsel initially litigated whether felony leaving the scene of an accident under Va. Code § 46.2-894 was a crime of moral turpitude per se, which would obviate an evidentiary hearing and require Mr. Rohde's automatic disbarment under D.C. Code § 11-2503 (a). The Board concluded that Mr. Rohde's conviction was not a crime of moral turpitude per se. The Board then ordered an evidentiary hearing to determine whether Mr. Rohde had committed a crime of moral turpitude on the facts. A hearing committee convened for three days spanning the end of 2007 and the beginning of 2008.

---

[3] A defendant may be convicted of "(i) a Class 5 felony if the accident results in injury to or the death of any person, or if the accident results in more than $1000 of damage to property or (ii) a Class 1 misdemeanor if the accident results in damage of $1000 or less to property." Va. Code § 46.2-894 (2005).

At the hearing, Mr. Rohde testified that he had no memory of his collision with Ms. Banks or of leaving the scene and that, when he learned the next morning that he might have been in an accident, he was shocked and scared. Mr. Horowitz corroborated that Mr. Rohde "clearly had no idea" what had happened the previous evening; he "turned white" when he learned about the apparent accident; and he was "very agitated" as a result. Mr. Rohde's expert, Dr. Whitfield, and Disciplinary Counsel's expert, Dr. Blumberg, agreed that Mr. Rohde was blackout drunk. Their only disagreement concerned the significance of that fact.

Dr. Whitfield, a medical doctor and psychotherapist who specializes in the evaluation and treatment of alcoholics, explained that during an alcoholic blackout, "working memory (short-term to long-term transfer and encoding), cognition (constructive thinking ability), and judgment" are lost. He further explained that the inability to create working memories would render an individual in a blacked out state "unable to react and decide in a rational and appropriate way to ordinary or extraordinary events." Dr. Whitfield opined that, because of Mr. Rohde's intoxication and blackout, he "was only able to retain awareness of his collision with Ms. Banks for seconds after it occurred" and "was not able to convert the new sensory input into a long term memory, or access the part of his long-term memory

that would have informed a proper response to the collision." Dr. Blumberg, a forensic psychiatrist, agreed that an individual experiencing an alcoholic blackout would have difficulty forming memories and would experience memory loss. But he opined that the individual would still, in the moment, "know right from wrong." Consequently, Dr. Blumberg opined that Mr. Rohde "would have understood that it was wrong to leave the scene, even if he did not subsequently remember having such knowledge or awareness." The Hearing Committee credited Dr. Whitfield's testimony in its entirety and Dr. Blumberg's testimony insofar as it was consistent with Dr. Whitfield's. Although Disciplinary Counsel challenged these findings before the Board, the Board declined to disturb them, concluding that they were "well-supported [by] the record."

Regarding his rehabilitation, Mr. Rohde presented evidence that he had completed a substance abuse program, regularly attended Alcoholics Anonymous (AA) meetings multiple times a week and had a sponsor, and participated in the Bar's Lawyer's Assistance Program (LAP). He also became active in AA as an organization, serving as his chapter's treasurer. He successfully completed his probationary sentence in his criminal case in 2007. Dr. Whitfield and Dr.

Blumberg agreed that Mr. Rodhe was taking his rehabilitation seriously and had an excellent prognosis for recovery.

Post-hearing briefing was completed in August 2008. In 2013, the Hearing Committee requested updated mitigation evidence because the evidence presented in 2008 had become "stale." In addition to the new evidence submitted by Mr. Rohde regarding his recovery,[4] the Hearing Committee considered evidence submitted by Disciplinary Counsel which it asserted reflected misrepresentations by Mr. Rohde about his still-pending disciplinary proceedings. The Hearing Committee issued its Report and Recommendation in January 2015. Disciplinary Counsel filed exceptions with the Board and moved for a formal proceeding. The Board held a hearing in April 2015 and issued its Report and Recommendation in August 2015. This appeal followed.

---

[4] Mr. Rohde presented evidence that he continued to attend AA meetings multiple times a week, was meeting with his sponsor once a week, and had become a sponsor for three other individuals. He also presented evidence of continuing to meet with a counsel from LAP once a month and volunteering for LAP, meeting with other attorneys with alcohol problems and speaking at local law schools.

## II.     Whether Mr. Rohde Committed a Crime of Moral Turpitude

D.C. Code § 11-2503 (a) (2012 Repl.) provides that "[w]hen a member of the bar . . . is convicted of an offense involving moral turpitude, . . . [his] name . . . shall be struck from the roll of the members of the bar and such person shall thereafter cease to be a member."  "Whether [respondent's] offense constitute[d] moral turpitude within the meaning of the statute is a question of law . . . committed to this court['s judgment]." *In re Spiridon*, 755 A.2d 463, 468 (D.C. 2000).  This court has distinguished "between offenses which manifestly involve moral turpitude by virtue of their underlying elements, and those which do not." *In re Colson*, 412 A.2d 1160, 1164 (D.C. 1979).  If an attorney's crime of conviction inherently involves moral turpitude—that is, moral turpitude per se—we have directed disbarment without more.  But if an attorney's crime does not inherently involve moral turpitude, the attorney is entitled to an evidentiary hearing to determine whether the underlying conduct involved moral turpitude on the facts. *See In re Allen*, 27 A.3d 1178, 1183 (D.C. 2011).

## A. Moral Turpitude Per Se

We first consider whether felony leaving the scene of an accident under Va. Code § 46.2-894 is a crime inherently "involving moral turpitude" within the meaning of D.C. Code § 11-2503 (a). Obviously, moral turpitude "does not exist merely because there has been a crime, [or] a violation of law." *In re Shorter*, 570 A.2d 760, 765 (D.C. 1990). Although "[i]n a sense, it is immoral to violate any law, even a traffic ordinance, . . . the words 'involving moral turpitude' clearly suggest something much more serious, for otherwise they are pure surplusage." *Id*. We determine whether a crime inherently involves moral turpitude by examining its elements. *See In re Colson*, 412 A.2d 1160, 1164 (D.C. 1979) (en banc). But, as we have acknowledged in previous cases, exactly what we are looking for "has not been defined with the utmost precision." *In re Johnson*, 48 A.3d 170, 172 (D.C. 2012); *see also Colson* 412 A.2d at 1167 (acknowledging that "moral turpitude has less than a finite definition"). As we summarized in *In re Johnson*,

> We have said that a crime necessarily involves moral turpitude if the act denounced by the statute grievously offends the moral code of mankind and would do so even in the absence of a prohibitive statute; if it involves baseness, vileness, or depravity in the private and social duties which a man owes to his fellow men or to society in general, contrary to the accepted and customary rule of right and duty between man and man; or if it entails conduct contrary to justice, honesty, modesty, or good morals. We have also looked to see if commission of the crime requires intentional dishonesty for

personal gain. Finally, we have observed that part of the calculus in assessing whether a crime is one of moral turpitude *per se* is whether we can say that the least culpable offender under the terms of the statute necessarily engages in conduct involving moral turpitude—or whether the Board will want to err on the side of admitting evidence that goes to the moral implications of the particular respondents['] acts, as a way of determining whether his particular offense involved moral turpitude.

48 A.3d at 172–73 (internal citations and quotations omitted).

Examples of criminal offenses that this court has concluded constitute crimes of moral turpitude per se include attempted murder,[5] child abuse,[6] obstruction of justice,[7] conspiracy to commit mail and wire fraud,[8] attempted extortion coupled with attempted witness and evidence tampering,[9] bribery,[10] forgery and grand larceny,[11] and espionage.[12]  Were we to plot these offenses as points on a graph, we would see a cloud of crimes evincing moral turpitude.

---

[5]  *In re Farren*, 118 A.3d 217 (D.C. 2015).

[6]  *In re Wortzel*, 698 A.2d 429 (D.C. 1997).

[7]  *In re Kluger*, 80 A.3d 648 (D.C. 2013).

[8]  *In re Brown*, 80 A.3d 1043 (D.C. 2013).

[9]  *In re Johnson*, 48 A.3d 170 (D.C. 2012).

[10]  *In re Glover-Tonwe*, 626 A.2d 1387 (D.C. 1993).

[11]  *In re Sluys*, 632 A.2d 734 (D.C. 1993).

[12]  *In re Squillacote*, 790 A.2d 514 (D.C. 2002).

Though the borders distinguishing these crimes from other violations of criminal law may resist precise delineation, for the reasons that follow we are unpersuaded that a conviction for felony leaving the scene of an accident as defined by Va. Code § 46.2-894 falls within this cloud.

We begin our analysis with Disciplinary Counsel's argument that "no one found guilty of a felony under § 46.2-894 would have had a morally weighty reason for leaving" the scene of an accident. But the question is whether the statute codifies a duty to stay, such that leaving would evince "baseness, vileness, or depravity." *Johnson*, 48 A.3d at 172. We cannot say it does. The statute does not distinguish between the person at fault and any other drivers "involved in an accident." Va. Code § 46.2-894. The statute encompasses accidents both "in which an attended vehicle or other attended property is damaged," and "in which a person is killed or injured." *Id.* The statute requires the crime to be prosecuted as a felony if property damage exceeds $1000 or a person is killed or injured but it does not set a threshold level of injury. *Id.* The statute does not distinguish between a failure to stop at all, a failure to provide complete information ("name, address, driver's license number, and vehicle registration number"), or a failure to provide information to all entities to whom disclosure is due. *Id.* Lastly, the

statute does not distinguish between the failure to stop and the failure to provide "reasonable assistance."[13]  The range of ways an individual might violate his or her statutory obligations, some obviously graver than others,[14] makes it impossible for us to conclude that the statute, in all applications, criminalizes conduct that "offends the generally accepted moral code of mankind," "involves baseness, vileness or depravity," or offends universal notions of "justice, honesty, or

---

[13] Virginia case law construing the statute requires "actual knowledge of the occurrence of the accident" "but "hold[s] the driver to a stricter reasonable man standard as to the fact or extent of the injury." *Kil* v. *Commonwealth*, 407 S.E.2d 674, 679 (Va. Ct. App. 1991).  That is, "[k]nowledge of injury may be imputed to the driver where the fact of personal injury is visible or where the seriousness of the collision would lead a reasonable person to assume there must have been resulting injuries." *Neel* v. *Commonwealth*, 641 S.E.2d 775, 778 (Va. Ct. App. 2007) (internal quotation marks omitted).  Thus, even a negligent failure to take note of injury, and the resulting failure to provide aid to the injured person, may subject the driver to felony prosecution under the statute. *Cf. Sanchez v. Holder*, 757 F.3d 712, 721 (7th Cir. 2014) (explaining that under the Indiana statute permitting felony conviction where "the driver should have known that an accident occurred or should reasonably have anticipated that the accident resulted in injury," the "evil intent or corruption of the mind" necessary to support a conclusion of moral turpitude *per se* was not manifest, and "further inquiry into the circumstances of [the convicted driver's] offense" was required to determine moral turpitude *vel non*).

[14] For example, a driver could be the last in line of a multi-car pileup where one person suffers whiplash or the frame of one car sustains more than $1000 worth of damage and still be subject to prosecution for a felony if she leaves the scene of the accident without complying with all the statute's obligations.

morality." *In re Tidwell*, 831 A.2d 953, 957 (D.C. 2003) (internal quotation marks omitted).

Disciplinary Counsel also argues that a violation of the statute "show[s] an effort to conceal the driver's identity" and "deprives the State of evidence," in this case "about the condition of the car and the driver, including his blood alcohol level at the time of the crime." We disagree that the myriad ways a driver might violate the statute would support an inference in all cases of a purpose to conceal her identity; for example, a driver might provide her name and address and still violate the statute if she fails to provide her vehicle registration number. Moreover, we cannot say that the exclusive or even primary aim of the statute, which applies to leaving the scene of all manner of accidents, is to facilitate evidence collection for criminal prosecution. But even if it were, we disagree that the failure of a private citizen to come forward to provide the government with inculpatory evidence evinces a moral failure on par with tampering with witnesses or obstructing justice.

We hold, accordingly, that the Virginia felony of leaving the scene of an accident does not "inherently involve[] moral turpitude." *In re Allen*, 27 A.3d at

1183. Mr. Rohde was therefore entitled to the comprehensive hearing he received before the Hearing Committee to determine whether the commission of this crime entailed moral turpitude on the facts.

## B.  Moral Turpitude on the Facts of the Crime

Disciplinary Counsel bore the burden to establish by clear and convincing evidence that Mr. Rohde's commission of felony leaving the scene of an accident involved moral turpitude on the facts. *See id.* at 1184.  The Hearing Committee and the Board both determined that Disciplinary Counsel failed to carry this burden.[15]  Again, our review is de novo. *Id.* at 1183.

Our inquiry to discern moral turpitude on the facts is not as limited as our inquiry to discern moral turpitude per se. In the moral-turpitude-on-the-facts inquiry, we refocus our lens and engage in "a broader examination of circumstances surrounding [the] commission of the [crime in question] which fairly bear on the question of moral turpitude in its actual commission, such as

---

[15]  On appeal to this court, Disciplinary Counsel abandoned its challenge to the fact-finding made by the Hearing Committee and adopted by the Board.

motive or mental condition." *Spiridon,* 755 A.2d at 466 (rejecting a purely elements-based analysis to determine if an attorney's crime reflects moral turpitude on the facts). Our objective, however, is still to discern whether the attorney has been convicted of "an *offense* involving moral turpitude, D.C. Code § 11-2503 (a) (emphasis added). *See Colson,* 412 A.2d at 1164 (explaining "[a]n attorney is subject to disbarment under the statute for his conviction of a *crime* involving moral turpitude, not for commission of an *act* involving moral turpitude") (emphasis added). We tether our analysis to the attorney's act of committing the crime and ask whether we can say that the attorney's commission of that crime manifests baseness, vileness, or depravity. *See, e.g., In re Allen*, 27 A.3d 1178 (determining attorney convicted of theft did not do so for personal gain); *In re Rehberger*, 891 A.2d 249 (D.C. 2006) (taking into account the vulnerability of attorney's assault victim and her status a client); *Spiridon*, 755 A.2d at 466 (focusing on the small amount of money stolen by respondent as well as his lack of venal motive).

In *Spiridon,* we determined that the attorney was not acting for personal gain but instead was motivated by "extreme stress, depression, and alcohol abuse." Borrowing Disciplinary Counsel's language, we referred to these conditions as

"mitigating factors." 755 A.2d at 466. But implicitly acknowledging the inaptness of Disciplinary Counsel's terminology, we also explained that "certain 'mitigating factors'" sometimes considered at the sanction stage—"such as the absence of a previous disciplinary record or expression of remorse"—could not be considered at the moral-turpitude-on-the-facts stage of the disciplinary analysis because they would be "totally irrelevant to whether a crime involved 'moral turpitude.'" *Id.* at 467. To clarify, our focus in the moral-turpitude-on-the-facts inquiry is not on "mitigating factors" but rather on "commission factors" and specifically on whether the attorney was acting in a manner that can be characterized as base, vile, or depraved.[16]

---

[16] The inquiry endorsed in *Spiridon* is thus "broader" than an elements-based analysis, but we have never said that it is "broad." *Post* at 35. Nor do the cases to which our concurring colleague cites support consideration of every action taken or decision made by a respondent that temporally precedes the commission of the offense, as our concurring colleague appears to advocate. *See In re Allen*, 27 A.3d at 1186–87 (focusing on respondent's motive for his crime and concluding it was the aberrational result of the exceptional stressors in his personal and professional life, rather than a desire for personal gain); *In re Rehberger*, 891 A.2d at 252 (focusing on the "circumstances of the transgression," specifically the fact that the victim of the respondent's battery crimes was a "quite vulnerable" and relatively young client); *In re Powell*, 836 A.2d 579, 580 (D.C. 2003) (addressing the moral-turpitude-on-the-facts inquiry only in a footnote and giving no indication of what information the court understood to be relevant as part of the "full set of facts" to be considered other than to note that they include "respondent's emotional state" at the time of the offense); *In re Tidwell*, 831 A.2d at 957–58 (*see infra* at 23–24; focusing on respondent's knowledge that he had hit and killed someone

(continued…)

Here, the Board correctly focused the moral-turpitude-on-the-facts inquiry on Mr. Rohde's mental state when he committed the crime of leaving the scene of an accident and "the testimony of [Mr. Rohde] and the experts" on that subject.[17] That mental state did not manifest moral turpitude. The Board adopted the Hearing Committee's finding that Mr. Rohde did not consciously shirk his obligations under Va. Code § 46.2-894 and knowingly drive away from an accident where the other driver had been hurt; instead he was in an alcoholic blackout and unable to conform his conduct to statutory obligations or societal norms. In light of these factual findings, the Board reasonably concluded that Mr. Rohde had not committed a crime of moral turpitude.

---

(…continued)
with his car); *In re Spiridon*, 755 A.2d at 469 (focusing on "the small amount of money stolen and observing that respondent's actions were not so much motivated by a desire for personal gain as by psychological disturbances").

[17] As noted above, the moral-turpitude-on-the-facts inquiry encompasses the "circumstances surrounding [the] commission of the [crime in question] which fairly bear on the question of moral turpitude in its actual commission," *Spiridon,* 755 A.2d at 466, which include, but are not limited to, motive and mental state. As explained below, no other commission factors relevant to the moral-turpitude-on-the-facts inquiry were raised in this case.

Disciplinary Counsel's arguments to the contrary lack support in either the record or our precedent. Disciplinary Counsel first argues that the Board effectively considered *Kersey* mitigation[18] twice when, as part of the moral-turpitude-on-the-facts inquiry, it took into account evidence that Mr. Rohde was in an alcoholic blackout and unable to exercise appropriate judgment. But the Board did not do this; as discussed above, it followed *Spiridon*, which expressly permits consideration of a respondent's motive and mental state during the commission of the crime.[19] Disciplinary Counsel's argument that motive and mental state should never be considered in a moral-turpitude-on-the-facts inquiry in felony cases, and that the rule in *Spiridon* should be limited to the misdemeanor context, lacks support in our law and fails as a matter of logic. *Spiridon* expressly relied on *Colson*, where this court explained that if a felony does not involve moral turpitude per se, "evidence as to the circumstances of the crime including the actor's

---

[18] *Supra* note 2 and *infra* at III.

[19] We acknowledge that our reference in *Spiridon* to motive and mental state as "mitigating factors," invites confusion with analysis under *Kersey*, and thus suggest the use of different terminology. See *supra* pp. 18–19.

knowledge and intention [must] be admitted."[20]   755 A.2d at 466; 412 A.2d at 1167.

Alternatively, Disciplinary Counsel argues that regardless of any finding that Mr. Rohde's alcoholic blackout precluded him from exercising appropriate judgment, Mr. Rohde's culpable mental state was established when he pleaded guilty and admitted that he "knew or should have known" that his collision with Ms. Banks had injured her and he left the scene anyway.  We disagree.  Mr. Rohde's guilty plea established the elements for the criminal offense of felony leaving the scene of an accident.  But that plea, which was not inconsistent with the evidence presented at Mr. Rohde's disciplinary hearing,[21] *compare Tidwell, infra* at 25–26, does not establish that he committed a crime of moral turpitude in this disciplinary case.  *See Shorter*, 570 A.2d at 765.

---

[20]   As we explained in *Spiridon*, 755 A.2d at 467, this court's decision in *In re Hopmayer*, 625 A.2d 290 (D.C. 1993), is not to the contrary; it holds only that once a crime has been determined to be one involving moral turpitude, disbarment is required and *Kersey* mitigation evidence may not be considered.

[21]   As the Hearing Committee noted, the prosecutor himself "informed the court that . . . Respondent was intoxicated 'to the point that he didn't know what happened.'"

Additionally, Disciplinary Counsel argues that in order to assess whether Mr. Rohde acted with moral turpitude, we must look back to his "deliberate" decisions to drink and to drive drunk when he had alternative means to get home which resulted in an "entirely foreseeable head-on collision that severely injured an innocent victim." We disagree. As explained above, although the moral-turpitude-on-the-facts inquiry is not limited to the elements of the offense, it is not an open-ended assessment of respondent's past behavior, character, or lifestyle.[22] Our

---

[22] Our concurring colleague both agrees with this statement, *post* at 34–35, and agrees with Disciplinary Counsel that the Board should have considered prior acts Mr. Rohde took as an untreated alcoholic in assessing whether his crime was one of moral turpitude on the facts. But our colleague does not explain how consideration of Mr. Rohde's prior, uncharged conduct does not entail the open-ended assessment he agrees is not permitted.

Like our colleague, we agree that we need not in this case define the precise boundaries of the moral-turpitude-on-the-facts inquiry. But, based on our precedent, *supra* note 16, we have no difficulty holding that the Board properly declined to consider Mr. Rohde's prior drinking and driving in assessing the moral turpitude of his leaving the scene of the accident. Our colleague's hypothetical scenario contemplating an attorney's premeditated plan (1) to get blackout drunk, (2) to use his car as a weapon to collide with others, and (3) then to leave the scene of any resulting accidents does not persuade us otherwise. Our colleague posits that because "the circumstances of the blackout in the hypothetical reflect moral turpitude," they should be considered in the moral turpitude assessment of the subsequent commission of the offense of leaving the scene of an accident. We focus however, not on the circumstances of the blackout, but rather on the circumstances of the crime of leaving the scene of the accident. If there were credited evidence that an attorney had carried out a premeditated plan to commit the crime of leaving the scene of an accident while in a blacked out condition (assuming the attorney's premeditation could persist when he was in that

(continued…)

focus is bounded by the offense of conviction—here the crime of leaving the scene of an accident[23]—and only facts that "fairly bear on the question of moral turpitude" in the "actual commission" of the offense are relevant. *Spiridon*, 755 A.2d at 467; *cf. Dawkins v. United States*, No. 14-CV-919, 2018 WL 3580701 at *8 (D.C. July 26, 2018) (relying on principles of relevance to impose temporal limits on the consideration of culpability evidence).

Those facts do not include Mr. Rohde's uncharged acts of drinking and driving, either earlier that evening or on prior occasions, as our decision in *In re Tidwell*, 831 A.2d 953 (D.C. 2003), another leaving the scene of an accident case (albeit prosecuted under New York law), confirms. Although in *Tidwell* we provided a detailed account of respondent's drinking history and his visit to a bar hours before the accident in the "Factual Background" section of our opinion, the

---

(…continued)

condition), we would consider evidence of such premeditation in assessing the moral turpitude of that crime. But Disciplinary Counsel in this case never argued Mr. Rohde's conduct was premeditated. Instead, Disciplinary Counsel sought to prove Mr. Rohde committed a crime of moral turpitude because he "knew or should have known" that he would get into an accident and then leave the scene, effectively espousing a negligence theory of moral turpitude, which we reject.

[23] Mr. Rohde was not convicted in Virginia or the District of driving under the influence of alcohol, reckless driving, or any other offense with elements relating to drinking or drinking and driving.

focus in our "Moral Turpitude" analysis was on the circumstances relevant to the commission of the offense of leaving the scene. Specifically, we highlighted "Mr. Tidwell's failure to stop his car after he hit Mr. Fruehaf [] with a force that shattered the right side of the windshield and was loud enough to be heard by neighbors in their houses" and his "failure to notify the authorities until several days later." *Id.* at 958. Based "[o]n this record" we concluded that "Mr. Tidwell's conduct fit[] easily within the definition of moral turpitude that this court has adopted in *Colson* and other cases." *Id.* We also rejected the respondent's subsequent attempt before the Board to show that "he might have been suffering from an alcoholic-induced blackout" as a belated and weak "effort to deny an element of the offense which he has already admitted," *Id.* at 960, based on the facts of that case. Just as the evidence in *Tidwell* supported a conclusion that the respondent had knowingly acted in a base, vile, or depraved manner when he left the scene of an accident, the evidence in this case does not.[24]

---

[24] Although Mr. Tidwell appeared to urge this court to consider "his broader history with alcohol," to defeat a determination of moral turpitude, *post* at 40, this court declined to do so. 831 A.2d 958, 959. Specifically, we rejected Mr. Tidwell's attempt to rely on a common thread of "alcohol problems," *id.*, in cases in which we concluded the respondent had not committed a crime of moral turpitude: *In re Reynolds*, 763 A.2d 713 (D.C. 2000), *In re Small,* 760 A.2d 612 (D.C. 2000), and *In re Hoare*, 727 A.2d 316 (D.C. 1999). *Id.* We concluded Mr. Tidwell's knowing decision to leave the scene of a vehicular homicide was

(continued…)

This is not to say that the comprehensive, totality of the circumstances analysis Disciplinary Counsel advocates for is never authorized—only that it is not authorized as part of the moral-turpitude-on-the-facts inquiry. It takes place at the discretionary sanctions stage, to which we now turn.

## III. The Appropriate Sanction

Although we conclude that Mr. Rohde did not commit a crime of moral turpitude, the fact remains that he collided head-on with Ms. Banks' car, severely injuring her and totaling her car; he then left the scene of the collision without assisting her or otherwise seeking help. Mr. Rohde concedes both that he committed a "serious crime" within the meaning of D.C. Bar Rule XI, § 10 (b)[25]

---

(…continued)

distinguishable from *Reynolds* because no one had been killed in that case as a result of the accident, and from *Small* and *Hoare* because the respondents in those cases, unlike Mr. Tidwell, did not leave the scene of the accident. *Id.* This court's rejection of Mr. Tidwell's argument that his drinking history precluded a finding of moral turpitude on the facts does not compel our consideration of Mr. Rohde's drinking history in this case.

[25] D.C. Bar Rule XI, § 10 (d) provides that when an attorney has been found guilty of a serious crime, including any felony, "[Disciplinary] Counsel shall

(continued…)

and that he violated Rule 8.4 (b) of our Rules of Professional Conduct.[26]  In light of this conceded misconduct, this court must consider whether some sanction is required to "maintain the integrity of the profession, . . . protect the public and the courts, . . . [and] deter other attorneys from engaging in similar misconduct." *In re Reback*, 513 A.2d at 231.

The Board, like the Hearing Committee, has recommended that Mr. Rohde be suspended from the practice of law for two years, with a showing of fitness required for resumption of practice, but that this sanction should be mitigated pursuant to *In re Kersey*, 520 A.2d 321 (D.C. 1987), such that his suspension would be stayed in favor of a three-year term of probation with conditions.  During this time he would not be required to give his clients notice of his probation as required by D.C. Bar R. XI, § 3 (a)(7).  Disciplinary Counsel seeks disbarment. "Generally speaking, if the Board's recommended sanction falls within a wide

---

(…continued)
initiate a formal proceeding in which the sole issue to be determined shall be the nature of the final discipline to be imposed."

[26]  Rule 8.4 (b) states that "[i]t is professional misconduct for a lawyer to . . . [c]ommit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects."  D.C. Rules Professional Conduct, 8.4 (b).

range of acceptable outcomes, it will be adopted and imposed . . . 'unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted.'" *In re Schlemmer*, 840 A.2d 657, 660 (D.C. 2004) (quoting D.C. Bar Rule XI, § 9 (h)(1)); *see also In the Matter of Haupt*, 422 A.2d 768, 771 (D.C. 1980) (acknowledging that this court will "respect the Board's sense of equity . . . unless that exercise of judgment proves to be unreasonable"). Examining the totality of the circumstances, including aggravating and mitigating factors, we adhere to the Board's recommended sanction.

We begin our analysis with Disciplinary Counsel's argument that we should exercise our discretion to disbar Mr. Rohde because, having engaged in a pattern of drinking and driving, he made a reprehensible choice to drive drunk with a full understanding of the potentially devastating consequences. We agree that any evidence regarding decisions Mr. Rohde made that ultimately led to his crime, his drinking practices, and his history of accidents is relevant to our totality of the circumstances analysis.[27] And yet, in weighing that evidence, we also consider

---

[27] To the extent Disciplinary Counsel suggests that it was incorrectly precluded from presenting evidence regarding Mr. Rohde's conduct and decisions

(continued…)

evidence that Mr. Rohde was suffering from a disease, alcoholism, "a hallmark" of which—as Disciplinary's Counsel's own expert agreed—is the "denial of the seriousness of one's problem and the potential consequence[] of one's continuing to drink." *Accord* Tim Wells, *When Lawyers Need Help*, WASHINGTON LAWYER, June 2016, https://www.dcbar.org/bar-resources/publications/washington-lawyer/articles/alcohol-abuse-lawyer-discipline.cfm (transcribing an interview with then-Disciplinary Counsel Wallace E. "Gene" Shipp, Jr. in which he rebuffed "the notion that alcoholism is the result of some sort of moral failing," and acknowledged that the "scientific research makes [it] clear . . . [that alcoholism is] a disease and it should be treated as a disease"); *see also* AMERICAN PSYCHIATRIC ASSOCIATION, *Alcohol Use Disorder*, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed. 2013) ("DSM-5").

---

(…continued)

prior to the accident, it has not briefed this argument with sufficient clarity, and we note that the Board found that

> it is undisputed that Respondent drank heavily for several years and suffered from occasional alcoholic blackouts, including on the evening in question. It is also undisputed that on the evening in question, Respondent drank heavily, paid for at least some of his drinks, retrieved his car, and followed his usual route home before colliding with Ms. Banks.

Such evidence is properly considered under *Kersey*, and we reject Disciplinary Counsel's argument that *Kersey* mitigation may not be considered in a case where a respondent has been convicted of a felony that is not one of moral turpitude. This court has previously applied *Kersey* mitigation in two types of analogous circumstances: (1) in cases where a respondent has engaged in uncharged felony-type conduct, *see, e.g.*, *In re Temple*, 596 A.2d 585, 586–87 (D.C. 1991); and (2) in cases where the misconduct results in a misdemeanor conviction, *In re Soininen*, 783 A.2d 619 (D.C. 2001). In light of these prior applications, we see no "reason in law or logic," *id.* at 622, to exclude felonious conduct that results in a felony conviction. To the contrary, such a limitation would ignore the animating principle of *Kersey*—that substance abuse "has a severe effect on human physiology and behavior," *Kersey*, 520 A.2d at 326—and give undue sway in disciplinary proceedings to the charging decisions of prosecutors. *See Brookens v. United States*, 182 A.3d 123, 133 n.17 (D.C. 2018) (explaining that "disciplinary proceedings . . . are not criminal prosecutions in any sense").

To be eligible for *Kersey* mitigation, Mr. Rohde must establish: (1) by clear and convincing evidence that he suffered from an alcoholism-related impairment at

the time he left the scene of the Virginia accident; (2) by a preponderance of the evidence that his alcoholism substantially caused him to engage in that misconduct; and (3) by clear and convincing evidence that he is now substantially rehabilitated from the effects of the alcoholism. *See In re Stanback*, 681 A.2d 1109, 1114–15 (D.C. 1996). As our discussion earlier in this opinion makes plain, the credited evidence satisfies the first two requirements.

This leaves the question of whether Mr. Rohde proved that he is substantially rehabilitated. We conclude he did. There is no dispute that Mr. Rohde ceased drinking after the accident, that he sought treatment, and that his recovery has been "excellent." It is likewise undisputed that he has sought to help others similarly situated. Mr. Rohde's sustained sobriety in the many years that have passed since his crime is resounding evidence of rehabilitation.

Disciplinary Counsel urges us, however, to consider other "equal flaws in his moral judgment." Specifically, Disciplinary Counsel argues that Mr. Rohde demonstrated "a pattern of denial and dishonesty" both affirmatively (in the affidavit submitted to this court describing his guilty plea and in a statement made by Mr. Rohde's attorney at his sentencing that "this" was "an aberration" on Mr.

Rohde's part) and by omission (in two *pro hac vice* applications filed by Mr. Rohde or a member of his firm in which Mr. Rohde failed to acknowledge the pendency of these disciplinary proceedings against him). Regarding the affidavit submitted to this court, we disagree that it misdescribed his admissions in his guilty plea. Regarding the other conduct, we defer to the Board's reasonable assessment of its significance. The Board saw no indication that Mr. Rohde or his counsel sought to mislead the court at his sentencing, given that Mr. Rohde had already "explained that he was undergoing treatment for alcoholism and described his drinking habits in detail." The Board found that the *pro hac vice* filings were misleading, but it also found that there was no evidence to support Disciplinary Counsel's claim that Mr. Rohde "intended to deceive his firm and acted dishonestly for personal gain." The Board further noted that these incidents were unrelated to the misconduct in question[28] and insufficient to overcome the strong evidence that Mr. Rohde took concerted, and by all accounts successful, steps to address the cause of his misconduct: his alcoholism. *See Kersey,* 520 A.2d at 327 ("[W]hen alcoholism has been a causal factor leading to professional misconduct,

---

[28] Mr. Rohde points out that Disciplinary Counsel early on commenced an independent disciplinary action based on one of his *pro hac vice* applications, which was stayed pending completion of this proceeding. We take no position on the merits of that separate matter.

rehabilitation from that condition will be considered a significant factor in imposing discipline."). The Board found that Mr. Rohde "ha[s] continued his law practice without incident" related to alcohol. We agree that an attorney who engaged in misconduct as a result of a disability but who no longer poses that danger to the public should not be punished "simply for punishment's sake." *In re Appler*, 669 A.2d 731, 740 (D.C. 1995).

Relatedly, we are mindful of the fact that alcohol abuse is a significant problem among members of the legal profession. One recent study co-sponsored by the ABA "found that 20 percent of licensed attorneys in the United States consume alcohol at rates associated with problem drinking," which is consistent with prior studies indicating that "lawyers experience alcoholism at approximately 2.5 times the rate for the general population." *When Lawyers Need Help, supra*. As Disciplinary Counsel recently acknowledged, "[i]f we can get a lawyer into alcohol or drug treatment, or mental health treatment, before there's a discipline problem, that creates a better situation for everyone—the lawyers, the clients, and the discipline system." *Id.* In this case, we reaffirm our determination in *Kersey* that, even if substance abuse gives rise to a disciplinary problem, treatment and staying the course of recovery is the optimal outcome and can allow an attorney to

keep her job and her professional identity. *See* 520 A.2d at 327 ("When alcoholism has been a causal factor leading to professional misconduct, rehabilitation from that condition will be considered a significant factor in imposing discipline.").

Accordingly, we adopt the recommendation of the Board and hereby suspend respondent Wayne R. Rhode from the practice of law in the District of Columbia for two years, with a requirement that he show fitness in order to be reinstated; but stay his suspension in favor of a three-year period of supervised probation on the conditions that he:

(a) not commit any other disciplinary rule violations;

(b) maintain his sobriety;

(c) be subject to sobriety monitoring;

(d) meet as frequently as necessary to maintain his sobriety with a representative of the D.C. Bar Lawyer Assistance Program (LAP); and

(e) attend Alcoholics Anonymous as often as he, his LAP representative, and other involved experts deem necessary.

Respondent will not be required to provide notice to his clients of the probation under D.C. Bar R. XI, § 3 (a) (7).

*So ordered.*

M<small>C</small>L<small>EESE</small>, *Associate Judge*, concurring: I agree with the court that we should adopt both (1) the conclusion of the Board on Professional Responsibility (Board) that Mr. Rohde's conviction for leaving the scene of an accident did not involve moral turpitude and (2) the Board's recommended sanction. I write separately because I do not agree with the court's analysis of the question whether Mr. Rohde's conviction involved moral turpitude on the facts. *Ante* at 15–24. Although our cases use somewhat varying language to describe the nature of the inquiry into whether a conviction involved moral turpitude on the facts, I have no quarrel with the formulation the court emphasizes: the Board must conduct an "examination of circumstances surrounding commission of the [crime] which fairly bear on the question of moral turpitude in its actual commission." *In re Spiridon*, 755 A.2d 463, 467 (D.C. 2000). As the court notes, *ante* at 16, that inquiry is broader than simply examining the elements of the crime. Conversely, as the court well expresses it, the inquiry "is not an open-ended assessment of respondent's

past behavior, character, or lifestyle." *Ante* at 21. Thus, for example, we have said that the inquiry into whether a crime involved moral turpitude on the facts should not take into account considerations "such as absence of a previous disciplinary record and expression of remorse," because those considerations are "totally irrelevant to whether a crime involved moral turpitude." *Spiridon*, 755 A.2d at 467–68 (internal quotation marks omitted).

Although we thus have a guidepost at each extreme, the language of our cases does not provide clear guidance about the exact line between those circumstances that may appropriately be considered in determining whether a crime involved moral turpitude on the facts and those circumstances that may not. Most of our cases speak in terms that suggest a broad inquiry. *See, e.g.*, *In re Allen*, 27 A.3d 1178, 1184 (D.C. 2011) ("Bar Counsel must show by clear and convincing evidence that respondent's conduct, *viewed in context*, involved moral turpitude on the facts.") (emphasis added); *In re Powell*, 836 A.2d 579, 580 n.1 (D.C. 2003) ("The Committee took into account the facts surrounding respondent's plea and found that, . . . *in light of the full set of facts* . . . , the crime did not constitute a crime involving moral turpitude.") (emphasis added); *Spiridon*, 755 A.2d at 466 (rejecting as unduly narrow approach that permitted "examination

solely of the events directly relating to the crime itself, that is, how the crime was committed"); *id.* ("[T]he Board was not only permitted but required to hold a hearing to determine whether respondent's conduct involved moral turpitude under *all the facts and circumstances* found at that hearing.") (emphasis added); *id.* at 467 ("We think therefore that [*In re McBride*, 602 A.2d 626 (D.C. 1992) (en banc)] permits a *broader* examination of circumstances surrounding commission of the [crime] which fairly bear on the question of moral turpitude in its actual commission, such as motive or mental condition.") (emphasis added); *id.* at 469 (referring to "the *totality* of the facts and circumstances") (emphasis added). Although the court disagrees that the language in these cases supports a conclusion that the inquiry into moral turpitude on the facts is broad, *ante* at 18 n.16, it seems to me indisputable that an inquiry into "the full set of facts" or "all the facts and circumstances" is a broad inquiry.

On the other hand, the language from *In re Colson* cited by the court, *ante* at 16–17, does somewhat cryptically suggest a more limited inquiry. 412 A.2d 1160, 1164 (D.C. 1979) (en banc) ("An attorney is subject to disbarment under the statute for his conviction of a *crime* involving moral turpitude, not for commission of an *act* involving moral turpitude.") (emphasis added). I do not believe that it is

necessary to determine in this case precisely how narrow or broad the inquiry into moral turpitude on the facts should be. In my view, even taking into account all of the conduct Disciplinary Counsel relies upon, Mr. Rohde's conviction for leaving the scene of an accident did not involve moral turpitude on the facts, given the Hearing Committee's conclusions about the role of untreated alcoholism in the offense.

The court does not take the approach just suggested. Rather, it concludes that Mr. Rohde's decision to drink and drive is outside the scope of the permissible inquiry into moral turpitude on the facts. *Ante* at 21–24 & n.22. I disagree with the court's approach in several respects.

First, I do not understand the distinction the court seems to draw between Mr. Rohde's blackout, which the court treats as relevant to moral turpitude, *ante* at 18–20 & n.17, and the circumstances that caused that blackout, which the court treats as irrelevant to moral turpitude, *ante* at 21–24 & n.22. I do not see how one can sensibly assess whether and how a respondent's blackout bears on moral turpitude without considering how the respondent came to black out. On that point, imagine the following hypothetical scenario. The respondent is not an

alcoholic but rather is a violent racist. He decides to get as drunk as possible and then drive around looking for a victim to run over. Accordingly, he gets extremely drunk, starts driving, has an accident, and leaves the scene of the accident. At a Bar-discipline hearing, the respondent introduces evidence, credited by the factfinder, that he was blackout drunk at the time he had the accident and left the scene. In my view, the blackout in this hypothetical scenario results from moral turpitude, rather than reducing moral turpitude. In the present case, by contrast, Mr. Rohde's conduct leading up to and during his crime appears to be attributable to untreated alcoholism. Taking that conduct into account, as I would assume for current purposes that we must, I conclude that Mr. Rohde's crime did not involve moral turpitude on the facts. I thus agree with the court, *ante* at 21–22 n.22, that this case is distinguishable from the hypothetical scenario outlined above, because the circumstances of the blackout in the hypothetical reflect moral turpitude, whereas the circumstances of the blackout in this case do not. The point of the hypothetical, though, is that it is not sensible to try to determine whether and how a blackout bears on moral turpitude without considering why the blackout occurred.

Second, the court suggests that if the inquiry into moral turpitude on the facts should properly take into account the circumstances that caused Mr. Rohde to

black out, then the inquiry must also take into account aspects of respondents' "past behavior, character, or lifestyle," including "every action taken or decision made by a respondent that temporally precedes the commission of the offense." *Ante* at 18 n.16, 21–22 & n.22. That is not so. When determining whether a respondent's conduct in committing a crime reflects moral turpitude on the facts, many aspects of the respondent's life and prior conduct are obviously not relevant. To take one of many examples, the fact that a respondent had committed an unrelated bank robbery five years earlier would surely be irrelevant to the inquiry into whether leaving the scene of an accident reflected moral turpitude on the facts. My disagreement with the approach taken by the court is not that the court fails to approve consideration of every aspect of Mr. Rohde's prior life. Rather, it is with the court's decision to approve consideration of Mr. Rohde's blackout but to preclude consideration of circumstances leading to that blackout that are arguably relevant to whether the blackout reflects moral turpitude.

Third, I fear that the court's opinion will create confusion for the Hearing Committees, the Board, and future divisions of this court. Although the court draws a distinction between the fact of Mr. Rohde's blackout and the

circumstances that caused that blackout, the court does not provide a concrete articulation or explanation of the basis for that distinction.

Finally, the approach adopted by the court conflicts with the approach this court took in *In re Tidwell*, 831 A.2d 953 (D.C. 2003). That case, like this one, presented the question whether a respondent's crime of leaving the scene of an accident involved moral turpitude on the facts. *Id.* at 957–60. When analyzing that question, the court in *Tidwell* did not limit itself to Mr. Tidwell's mental state at the time of the crime. *Id.* To the contrary, the court explicitly considered Mr. Tidwell's broader history with alcohol. *Id.* at 958 (noting Mr. Tidwell "suffered from [an] alcohol problem[]"); *id.* at 959 (distinguishing Mr. Tidwell's situation from that of respondent in earlier case by pointing out that earlier respondent "did not have any alcohol problems, nor was he likely to commit a similar act in the future. The same cannot be said with respect to Mr. Tidwell."). These passages from *Tidwell* are considered parts of the court's analysis of whether Mr. Tidwell's conduct in leaving the scene of an accident involved moral turpitude on the facts. In my view, the court exceeds its authority by treating as irrelevant circumstances that the court treated as relevant in *Tidwell*. *See, e.g.*, *Seminole Tribe v. Florida,* 517 U.S. 44, 67 (1996) ("As a general rule, the principle of *stare decisis* directs us

to adhere not only to the holdings of our prior cases, but also to their explications of the governing rules of law.") (internal quotation marks omitted); *see generally M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971) (divisions of this court are bound by prior decisions of court).

For the foregoing reasons, I respectfully concur.